Lawrence P. HIGGINS, Plaintiff-Respondent,

v.

PAUL HARDEMAN, INC., et al., Defendants,

Paul Hardeman, Inc., Defendant-Appellant.

Lawrence P. HIGGINS, Plaintiff-Respondent,

v.

PAUL HARDEMAN, INC., et al., Defendants,

Steelweld Equipment Company, Defendant-Appellant.

Nos. 33598, 33599.

St. Louis Court of Appeals, Missouri.

July 28, 1970.

Motion for Rehearing or for Transfer to Supreme Court Denied Sept. 11, 1970.

**944**

Robertson, De Voto, Wieland & Lange, St. Louis, for Paul Hardeman, Inc.

Carter, Brinker & Doyen, Lee M. Carter, Clayton, for Steelweld Equipment Co.

Padberg, Raack, McSweeney & Slater, St. Louis, for plaintiff-respondent.

BRADY, Judge.

■ Plaintiff's father was fatally injured while working on a dump truck manufactured by defendant Paul Hardeman, Inc. and sold by defendant Steelweld Equipment Company. In the verdict directing instructions as to both defendants liability was submitted upon the hypothesis the "* * * hydraulic lift was defective in that the control rods were dangerous and not reasonably safe for their intended use, * * *." Verdict and judgment were for plaintiff and against both defendants in the amount of $10,000.00. Defendants appeal contending plaintiff failed to make a submissible case against either of them. In determining this issue we are required to view the evidence in the light most favorable to plaintiff and the facts are herein so stated.

Hardeman admits it manufactured and Steelweld admits it installed and distributed the hydraulic lift. Neither introduced evidence at the trial other than a photograph of the truck. It is undisputed the accident was not caused by any mechanical failure or malfunction. Both defendants pled that deceased's own actions caused his death.

The warehouse supervisor for Millstone Construction Company, who was in charge of the truck drivers and equipment for the company, described the operation of this truck and hoist involved. From his evidence it appears that one of the two levers inside the cab engages the hoist itself while the other controls its upward and downward movement. This second lever was connected directly to a sensitive control rod located at the rear of the truck under the bed and above the frame. This rod was so sensitive that very slight pressure (between five and twenty-five pounds) upon it would cause the bed of the truck to drop very swiftly and hard. Five pounds pressure was demonstrated by the use of one finger. When the control rod was moved the steel lever inside the cab moved also. There were a number of normal maintenance duties which a truck driver had to perform and which required him to put the bed of the truck up in the air and to work under it. These included oiling the bearings, an entire grease job, some rear grease fittings where the body is hinged at the back of the truck, washing or painting the top or back of the cab of the truck itself, and removing mud, dirt or other debris from the bottom of the cab protector which extends over the top of the cab or from the top of the cab itself. Deceased had used this truck for a short time in the morning and then had returned it to the garage complaining that the tailgate on the truck was stiff and not operating properly. He was advised to oil those bearings underneath the forward edge of the bed of the truck which control the operation of the tailgate. Deceased then left this truck (referred to as the Ford truck) and drove a White truck the rest of the day. After returning to the yard in the White truck late in the afternoon plaintiff went to oil the bearings on the Ford truck about which he had earlier complained.

Deceased, a driver of some thirty-five years experience, was discovered in a standing position pinned against the back of the cab by the dump bed which was in a partially raised position. One of his arms was hanging down and below his hand was an oil can. One of his feet was on the top of the chassis and the other was tangled in the control rods so that the bed would not rise. After removing deceased's shoe and twisting his foot clear of the control rods, it was possible to raise the bed from deceased by use of the levers in the cab. The bottom of deceased's shoe showed a clear impression the exact size of the top of the exposed control rod.

Using plaintiff's Exhibit 6, the mechanism along the underside of the forward edge of the bed of the truck which deceased was attempting to oil at the time of his accident was explained. It was possible to have oiled the two outside bearings with it down, but, as a witness stated, he had never oiled even these bearings with the bed of the truck down and the center bearing of the mechanism could not be oiled with the bed down.

When the dump truck body was in a raised position, the control rod was plainly visible to one looking downward. There was nothing concealed or not open and obvious about the location of the control rod. This truck and two others on which Steelweld had installed similar hoists were the only ones the supervisor ever saw having a hoist where the control rod protruded above the frame. He testified that while deceased had driven and worked on trucks for many, many years, deceased had never had any experience with this particular truck before the morning of the day of the accident, or with any truck having this type hoist.

Plaintiff's expert witness Martin testified that the hydraulic lift system on this truck could not be considered reasonably safe for the reason that there is a killing force, the weight of the body of the truck, which can be released by some mechanism other than the intended control mechanism in the cab of the truck. An accidental operation of the control rod could operate the valves of the lift system equally as well as the intended lever in the cab of the truck, causing the dump body to drop. The truck could have been made reasonably safe by having the lever in the cab of the truck have a catch on it the way many levers in truck operation have, so that some positive releasing action to the lever in the cab of the truck must be taken before the dump body can lower, with the result the cab would be the only place from which the bed could be released accidentally or on purpose. The device should be such that it did not require an operator to set the device on to a safe position, but rather that when the lever was put into an operating position to raise the dump body, it would automatically be in a safe position so that contact at the control rod at the back of the cab would not cause the body to come down. The witness stated his opinion this was an elementary safeguard.

Joseph H. Doering, Vice-President and Sales Manager of the defendant Steelweld Equipment Company, was called by plaintiff as a witness. He stated that his company had installed the hydraulic lift and the control rods in question according to specifications of the manufacturer, defendant Paul Hardeman, Inc. He further admitted that his company had installed no devices to hold the steel control lever in place in the cab of the truck, and further, that if this control lever could not be moved, then the exposed control rod under the bed of the truck could not have been moved by accidental contact with it. The witness also testified that with an angle iron welded over the exposed control rod, or a pin placed in the lever of the truck, a man would know that if he hit any of the controls under the bed of the truck the hoist would not come down on him. Accidental contact with the rod could also have been avoided by simply welding a piece of channel iron over the top of the rod, covering it, and then if it was stepped on the rod itself would not be touched. With such a channel iron piece welded in place, a person could jump on it or stand on it or do anything he wanted and not trip the control rod which would cause the bed of the truck to come down. Such a channel iron was put on the other Ford truck by the mechanical department at Millstone Construction Company a day or so after the deceased was killed and the job took approximately one-half hour labor and approximately $2.00 to $3.00 of material. There was testimony as to several other simple changes which could easily have been made. According to the warehouse supervisor, such changes were not made during the four years of use

because the truck was out on a job and not directly under his control for much of the time, and further, that they had no reason to make such changes since they did not suspect this "booby trap", as the witness described it, was present.

This particular type of dump truck had been manufactured since about 1958. The Steelweld Company had been distributing and selling the Daybrook dump truck bodies of this design from the time it was first manufactured in 1958, and sold eighty to one hundred a year. The production of this particular model was discontinued in 1962. A diagram showing a newer model hoist used on similar installations, which came on the market in 1962 (two years before the accident), wherein no part of the control rod protruded above the frame or chassis of the truck was introduced into evidence.

There was shoring available some three hundred feet or more away from where deceased was oiling the truck. It consisted of 4 x 4's or 6 x 6's weighing anywhere from twenty-five to forty pounds each. If the deceased was going to use shoring on the day in question, he would have had to go down to where it was and get either two 4 x 4's or one 6 x 6 and bring it back to where the truck was. The shoring was kept in a storage area and it was not the place to do jobs like greasing or oiling, which were to be done in the truck shop. If shoring was used but it broke or slipped out and the rod was contacted, the dump bed would come down just as if there was nothing there. It was also possible to be killed while attempting to place the shoring.

The witness Richardson testified that if he were oiling the linkage under the bed of the truck which controlled the operation of the tailgate he would have been in the same position that the deceased was found.

His testimony was that a small job like oiling the under carriage would only be a matter of a minute or two and that he would not have shored it up because it involved too much time to get the shore, put it up, remove it, and carry it back to where it was for such a small job. He also gave his opinion that to do this particular type of oiling job he would not have used a shore, and among the other drivers a lot less than 50% would have used shoring.

The case was submitted to the jury by an instruction hypothesizing the manufacture of the lift and control rods by Hardeman and then required the jury to find: "Third, said hydraulic lift was defective in that the control rods were dangerous and not reasonably safe for their intended use, Fourth, that said defect existed at the time of the manufacture by said defendant, Fifth, as a direct result, Arthur Higgins died. Submitted by plaintiff. Not in M.A.I." The instruction as to Steelweld was the same except for hypothesizing its installation of the lift and rods and that the defect existed at the time of installation.[1]

The rule of strict liability set forth in the Restatement, Second, Torts § 402A, as adopted in this state in Keener, supra, requires proof the defendants were engaged in the business of selling the hoist here involved and that it was expected to and did reach the deceased in substantially the same condition in which it was sold. Since there is no dispute as to these matters, it follows from further reference to the rule that regardless of negligence or absence of contractual relation defendants are liable to plaintiff for the death of his father if the hoist constituted a "defective condition unreasonably dangerous" to the deceased unless the deceased was contributorily at fault.

1. As will later appear, defendants urge in their briefs the hoist was being used in a manner for which it was not intended. It would therefore seem that this was an issue in the case. If it was it should have been submitted as provided in Keener v. Dayton Elec. Mfg. Co., Mo., 445

S.W.2d 362 [7]. However, defendants make no attack upon the verdict directing instruction in this appeal and we note the matter only to emphasize that our recitation of the plaintiff's verdict directing instruction is not to be considered as blanket approval of that instruction.

In response to defendants' motions for directed verdicts, we are first asked to rule that as a matter of law a "defective condition" could not be found to exist under the circumstances of this case. Since the hoist did not disintegrate, break down, crack or fail, it follows that plaintiff's position must be that the design of the hoist—that is, the fact that the control rods were positioned above the chassis and the truck bed could come down upon the application of a slight amount of pressure to the control rods—resulted in the "defective condition" being created. In Keener, supra, plaintiff's husband was electrocuted in attempting to repair a friend's allegedly "defective" sump pump. The defect alleged was that the pump was not equipped with a ground wire or overload protector. We can discern no reasonable ground for distinguishing between a pump designed without a ground wire or overload protector and a hoist designed so that a very slight pressure upon an exposed control rod causes the body to fall whether or not the operator wants it to do so. In both instances the "dangerous condition" is the failure of the design to include a safety factor. The evidence was that deceased had certain normal maintenance duties to perform which required him to raise the bed of the truck by use of the hoist and to work under it; that he had trouble with a part of this truck bed earlier in the morning and was advised to oil the bearings; and that while the two outside bearings could have been oiled without the hoist raising the truck bed, the center bearing could not have been nor could certain other normal maintenance duties be accomplished while the bed was down. In addition, we note the slight amount of pressure needed to bring the bed down and the exposed position of the control rod above the chassis located in a place where a driver would have to stand to perform the maintenance duties required when the bed was raised. Under such circumstances we cannot hold that as a matter of law plaintiff failed to make a submissible case as to the existence of a "dangerous condition."

Did the plaintiff make a submissible case as to the defective condition being "unreasonably dangerous"? The evidence going to this issue, taken in the light required of us, was that deceased had never had any experience with this type of hoist previous to the brief time he drove this particular truck on the day he was killed. A fair inference to be drawn from the evidence as to the limited numbers of this type of hoist that were manufactured and installed is that the vast majority of trucks deceased would have come into contact with did not have this defect. There is no evidence as to the deceased's intelligence or education. The only evidence upon which the defendants can rely is that the deceased was a truck driver of some thirty-five years experience and that the control rod was plainly visible when the bed was raised. The simple answer to defendants' reliance upon deceased's long experience as a truck driver is that his long experience was not with this type of hoist. Defendants' argument based on the open and obvious position of the control rod would seem more pertinently made in connection with their contention we must find as a matter of law the deceased was contributorially at fault. What we now hold is equally applicable to that issue and will not be repeated when later herein we rule that point. In view of the nature of the operation of the hoist the issue is not whether deceased could see the control rod; it is whether by seeing it he would know from its appearance that a slight force exerted upon it would cause the bed of the truck to come crashing down regardless of the position of the control lever in the cab of the truck. The issue is not the deceased's ability to see the control rod but whether upon seeing it he would have known the mechanical principle involved and the danger of exerting any force upon it. In view of the evidence as to his lack of experience with this type of hoist involving this mechanical principle and the

corresponding lack of any evidence as to his superior knowledge or training or education which would make him cognizant of that principle, we hold there was a jury issue raised as to the control rods being dangerous and not reasonably safe; i. e., unreasonably dangerous.

Defendants then contend that plaintiff failed to make a submissible case because as a matter of law the hoist was being used in a manner for which it was not intended. The Restatement, § 402A, supra, at Comment (h), paraphrased in the light of the facts of this case, requires a product to be safe for normal use; if it is abnormally used and injury results, then the product may not be found to be in a defective condition. Keener, supra, directs this issue to be submitted in language hypothesizing the use of the article "in a manner reasonably anticipated". The statement to the effect defendants are not liable for injuries resulting from abnormal use is only true if such abnormal use was not reasonably foreseeable. "The issue is one of foreseeability, and misuse may be foreseeable." Products Liability, Frumer & Friedman, § 15.01. Foreseeable use may be different from its intended use and includes any particular use which should be known to a reasonably prudent manufacturer. Dunham v. Vaughan & Bushnell Mfg. Co., 86 Ill.App.2d 315, 229 N.E.2d 684. The evidence that there were a number of duties which a driver had to do as part of normal maintenance and which could only or which could best be performed when the bed of the truck was in a raised position established this element of plaintiff's case.[2] While the defendant Hardeman briefs the point that plaintiff failed to make a submissible case in that his evidence failed to establish the hoist was the proximate cause of deceased's death, the only argument going thereto deals with the

alleged misuse of the hoist as causing the death. What we have above held also disposes of that issue.

The last point raised by either defendant rests upon defendants' interpretations of the fact deceased failed to use shoring when he raised the truck bed to oil it on the occasion leading to his death. Defendant Hardeman couches its allegation of error and argument in respect thereto in the language of "contributory fault". Defendant Steelweld states his presentation of the point in this manner: " * * * plaintiff cannot recover in this case if he was aware of the danger, knew the alleged defect and unreasonably exposed himself to danger." The difference between the two is semantic only. In Keener the language in which Steelweld couches its contention is characterized as "contributory fault". The Restatement at Comment (n) reads: "Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of *assumption of risk,* is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." (Emphasis supplied.) Regardless of the name of the defense, be it assumption of risk or contributory fault or whatever name the court then considering the matter may assign to it, the gut issue is not whether the defect was discovered but whether the product was unreasonably used after discovery of the defect.

---

2. By reference to the verdict directing instruction, it will be seen that there was no submission of this element. Keener was handed down in September of 1969 and this case was tried earlier (May) of that same year. Again we warn that the instruction given in this case is not to be taken as approved but the point is not to be ruled here due to defendants' failure to make any attack upon that instruction in this appeal.

■ Before passing on this issue we pause momentarily to rule upon plaintiff's contention defendants have failed to properly preserve this issue for our ruling. Plaintiff's argument is that defendants failed to plead and submit the issue and therefore waived it. While the language of each defendant's pleading in this regard differs due to its approach to the subject as one of contributory fault or assumption of risk, the plain provisions of both answers sufficiently set forth the defense. Neither was the issue waived because it was not submitted. Defendants' position is that the trial court erred in not ruling plaintiff was barred from recovery on this ground as a matter of law. Under such circumstances the failure to submit the issue should not constitute waiver. In ruling plaintiff made a submissible case as to the defect being "unreasonably dangerous", we have indicated there was no evidence of any previous experience on the part of deceased with this type of hoist; no evidence as to his intelligence or education; nor any other evidence that would allow us to rule as a matter of law that even if he saw the exposed control rod he could appreciate and understand the mechanical principle upon which it operated so that he knew that if he stepped upon the control rod the hoist would allow the bed to come down. It follows the issue of whether deceased was unreasonably using the product after discovery of the defect must be ruled adversely to defendants for the reason that we cannot rule as a matter of law he did in fact discover the defect.

It should also be noted the evidence was that there were no posted or written rules concerning the use of shoring. There was a verbal rule that shoring was to be used especially in doing a job which would require getting under the truck bed. The deceased was not individually told anything on or, so far as the evidence in this transcript shows, prior to this particular occasion about the use of shoring. Defendants' contention is based upon their interpretation of the evidence as establishing as a matter of law a "custom and practice" to use shoring. The evidence as to this issue was that drivers were supposed to use shoring but that, in practice, for a job such as that in which deceased was engaged at the time of his death, one that took a very short time, shoring was used only about half the time. One witness testified that drivers did not use shoring for a job such as this because it involved too much time in getting the wood, carrying it to where you were working, setting it up, removing it and then carrying the shoring back to where it was to be stored. Both the witness Higgins and the witness Martin, the latter a consulting engineer, testified that a man might well be killed or injured by contacting the connecting rod while attempting to put the shoring in place. Under such circumstances we cannot hold that as a matter of law the deceased was contributorily at fault or had assumed the risk by not using shoring.

The judgment is affirmed.

WOLFE, P. J., and DOWD, J., concur.