Mrs. Carnell RUSS, etc., et al., Appellants,

v.

Charles Lee RATLIFF, etc., et al., Appellees.

No. 76–1007.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1976.

Decided July 27, 1976.

Rehearing and Rehearing En Banc Denied Aug. 18, 1976.

**800**

James I. Meyerson, N.A.A.C.P., New York City, for appellants; Nathaniel R. Jones, N.A.A.C.P., New York City, and George Howard, Jr., Pine Bluff, Ark., on the briefs.

Lewis D. Smith, Little Rock, Ark., for appellee State.

Odell C. Carter, Star City, Ark., for appellee City.

Before BRIGHT, STEPHENSON and WEBSTER, Circuit Judges.

BRIGHT, Circuit Judge.

Carnell Russ, a 24-year old black man, was shot to death by a Star City, Arkansas, policeman, Charles Lee Ratliff, following Russ' arrest for speeding on Memorial Day afternoon, May 31, 1971. Russ' widow and children (appellants) unsuccessfully sought to recover damages for alleged violation of Russ' civil rights pursuant to 42 U.S.C. § 1983, and, relying upon pendent jurisdiction, under the Arkansas wrongful death act, Ark.Stat.Ann. §§ 27–906 *et seq.* The widow and children were denied recovery in district court and now bring this timely appeal. We affirm in part and reverse in part, granting a new trial against appellee Ratliff.

Mrs. Russ[1] named as defendants Star City policeman Ratliff; Jerry Green, an Arkansas highway trooper who arrested Russ; Norman Draper, who was to start working as a Star City policeman the day after the shooting and was on the day of the incident here in question accompanying Ratliff for the purpose of familiarizing himself with police procedures; Lynn Thomasson, mayor of Star City; and six others, all members of the city council of Star City, Arkansas. Only Officer Ratliff, State Trooper Green, and Draper witnessed the shooting incident.

The case was tried to a jury. At the close of plaintiffs' case, the district court granted a partial directed verdict dismissing the claims against Draper, Mayor Thomasson, and the members of the city council. The suit continued against Green and Ratliff but the jury denied any recovery against those defendants. Following the adverse jury verdict, Mrs. Russ unsuccessfully sought a new trial or judgment n. o. v. against Green and Ratliff. Thereafter, she brought this appeal from the judgment, contending that the trial court erred in dismissing Draper and the city officials from the case and in denying her a new trial or judgment n. o. v. as against Green and Ratliff.

I. *The Factual Background.*

The parties do not dispute the essential background facts. Arkansas State Trooper

---

1. While for convenience we refer only to Mrs. Russ' action, our rulings also apply to the claims of her children.

Jerry Green arrested Russ for driving 75 miles per hour in a 60 m. p. h. zone about six miles outside of Star City. In the car with Russ were his wife, six of his minor children, and another unrelated individual.

Trooper Green directed Russ to drive his car into Star City. In response to a radioed message from Trooper Green, Officer Ratliff, who was in a Star City police car accompanied by Draper, met Green and Russ at the courthouse in Star City.[2]

From this point forward, the testimony contains some discrepancies as to exactly what occurred. Because the primary claim is against Ratliff, we will state the facts most favorably to him, relying primarily upon his testimony. Where important, we will note conflicting testimony.

According to Ratliff, the radio call did not state and he did not know why he was asked to meet Green at the courthouse. Ratliff had left his "slapper" in the car as he normally did. He did not have mace because his spray can had become inoperable. Ratliff carried a six-shot revolver (a Magnum 357 Colt Trooper Three) with five rounds loaded and the hammer resting on an empty chamber. When Ratliff met Green at the courthouse, Green asked him to make arrangements for a bond for his prisoner, Russ. Russ, however, requested that he be released on his own recognizance.

Although state law gave Green discretion to release Russ on the basis of his signature and a promise to appear in court, Green refused to release Russ.[3] Ratliff then spent some time on the telephone trying to contact the sheriff or his deputy to obtain authority to release Russ without bond but he was unsuccessful. During this period Russ also made one or more telephone calls, apparently attempting to locate his father. These calls were unsuccessful.

There is testimony that Russ then asked that he be allowed to post a personal check. This offer, too, was refused. Some testimony indicated that Ratliff lacked authority to accept such a check. Ratliff demanded $23 by way of a cash bond. Russ then went to his car and returned with money held in his clenched fist. Neither Ratliff nor Draper recalled seeing the money, however.

Russ then demanded that Green give him a copy of the ticket. Green told Russ that the receipt which Ratliff was prepared to provide was all that he needed and that the ticket would be retained for the local court. Green's refusal to give Russ a copy of the ticket apparently violated state law. Ark. Stat.Ann. § 75–1008(d). See note 3 supra.

When denied a copy of the ticket, Russ became angry and started to curse the officers. Ratliff asked Russ if he had money and was willing to post bond and accept the

---

**2.** Ordinarily, the sheriff's office would process arrests made by a state trooper in the county, but in this case neither the sheriff nor his deputy was available to answer the radioed call.

**3.** The relevant Arkansas statute provides:

*75–1008. Arrested persons given 5 days' notice to appear in court where not immediately taken—Release upon written promise— Violations of officers.*—(a) Whenever a person is arrested for any violation of this act punishable as a misdemeanor, and such person is not immediately taken before a magistrate as hereinbefore required, the arresting officer shall prepare in duplicate written notice to appear in court containing the name and address of such person, the license number of his vehicle, if any, the offense charged, and the time and place when and where such person shall appear in court.

(b) The time specified in said notice to appear must be at least 5 days after such arrest

unless the person arrested shall demand an earlier hearing.

(c) The place specified in said notice to appear must be before a magistrate within the township or county in which the offense charged is alleged to have been committed and who has jurisdiction of such offense.

(d) The arrested person in order to secure release, as provided in this section, must give his written promise so to appear in court by signing in duplicate the written notice prepared by the arresting officer. The original of said notice shall be retained by said officers and the copy thereof delivered to the person arrested. Thereupon, said officer shall forthwith release the person arrested from custody.

(e) Any officer violating any of the provisions of this section shall be guilty of misconduct in office and shall be subject to removal from office. [Ark.Stat.Ann. § 75–1008.]

receipt. There is a dispute as to Russ' exact response,[4] but in any event, he refused to turn over his money without a copy of the ticket. Ratliff then informed Russ that he would have to enter a jail cell. Russ refused to enter the cell and, according to Ratliff, squared off in a fighting stance "dancing and prancing around like a boxer" and announced that "[a]ll three of you m. f.'s can't put me in there." Ratliff then took Russ by the elbow to lead him into the cell. Ratliff's version of the incident proceeds as follows:[5]

I ducked the swing and knocked him back against the wall with my fist. * * He [Russ] came off swinging again. * * I knocked him back again [with my fist]. * * * He didn't fall. He's a big man. [Each blow knocked Russ back against the wall, a distance of about eight or ten feet.]

He settled down like a fighter then. He quit his dancing and he started swinging then, I mean sure enough, haymakers. * * * I hit him a couple of times with my fist, maybe three or four, I don't know.

Well, I let him swing, I don't know, maybe a dozen times and finally I decided Green had panicked or something, he just stood there froze and the boy was nearly hitting him, going by and coming by, and he never moved, so I didn't have a slapper and didn't have no gas and I wasn't paid to stand and fist fight nobody so I used my gun as a slapper. I hit him up side the head and knocked him to the office, all the way across it. He went through the door and and hit the wall, across a space like this room, and he come back still [fighting]. [Ratliff hit him again with his gun.] There was a gun went off, I don't know whose it was.

The shot came from Ratliff's gun. It struck Russ between the eyes at a slight angle and inflicted a fatal wound.

Draper's testimony largely accords with that of Ratliff. He described the events after Russ refused to enter the cell as follows:

So Officer Ratliff with his right hand reached up and got Mr. Russ by the left elbow to start to lead him toward the jail. Mr. Russ drew back, and got in a fighting stance—and drew back as if to strike Officer Ratliff. Officer Ratliff came up with his left hand and connected somewhere in the vicinity of his mouth with his fist.

\* \* \* \* \* \*

Immediately as Ratliff grabbed—put his hand on Mr. Russ' elbow. Mr. Russ drew back and made a swing and Ratliff come around with his left hand, and hit him in the vicinity of the mouth. And, there was some—a couple, or three licks passed—maybe more I can't really say.

There was a scuffling going on, the touching of each other, and so forth. The next thing I knew—I did start at one time to step in and try to assist Ratliff. At that time he drawed his gun. And, he come out and made a swing, and hit Mr. Russ over the head somewhere in this vicinity. He fell back up against the frame of the doorway. The second time he swung again, he [Ratliff] was stretched away out—similar to that, and when the gun discharged Mr. Russ fell back against this petition [sic].

\* \* \* \* \* \*

It was just a matter of a very few seconds. It wasn't a very long time. It was real short—period.

As did Draper, Trooper Green testified that the incident occurred in just a few seconds. Green further testified that

\* \* \* Mr. Ratliff reached to get [Russ] by the arm. \* \* \*—Mr. Russ drawed back and squared off—like a

---

**4.** The witnesses disagree as to Russ' response to the question of whether he had obtained sufficient money from the occupants of the car. Ratliff testified that Russ "told me it was none of my business." Draper said that Russ responded "I've got a hell of a lot more than

that." Green testified that Russ responded, "You'll get your money, baby," or "something to that effect."

**5.** The order of the paragraphs has been altered to provide continuity.

fighter would do. And, I don't—I don't recall if he swung at Mr. Ratliff—or—I don't recall that. All I know is he squared off as if to fight. And, at that moment—from there I seen a gun come up, and— * * *

Q. Did you see * * * any fist-blows?

A. No, sir.

> * * * * * *

I don't recall any—any fighting or—no licks. I don't recall other than just Mr. Russ squaring off. I don't recall any licks * * *.

At this point in time—this gun. I seen this gun come up, and as it—as his [Ratliff's] arm extended the shot was fired.

> * * * * * *

From the time he squared off [until the time of the gunshot]—it was just a matter of—of seconds. * * * Possibly two seconds—three seconds. Just a short—just a short period.

> * * * * * *

Q. Did you have any opportunity to intervene in that altercation?

A. No, sir. I did not.

Thus, Green testified that he saw no significant fisticuffs before Ratliff drew his weapon and shot Russ and that events occurred so rapidly that he had no opportunity to intervene.

The autopsy report indicated that Russ had been struck on the mouth and elsewhere on the head, supporting the testimony of Ratliff and Draper that Ratliff had struck Russ several times before the firing of the fatal shot.[6]

Several experts were called who testified that the fatal shot was fired from a distance of between 18 inches and four feet from Russ' head.

An accident reconstruction expert testified that he had conducted tests on a new gun of the same model as that carried by Ratliff.[7] This expert testified that because the design of the gun included an "interposing device" it would not discharge unless the trigger were pulled. He also testified that the gun had a "heavy" trigger and that he had not been able to "accidentally" pull the trigger by slinging the gun forward as if to hit someone with it. However, on cross-examination, he conceded that with use the trigger could become slightly easier to pull, although he said that the gun would never be a "hair trigger." He said that with such an older gun, it was conceivable, though not likely, that the trigger could be pulled inadvertently while it was being used as a slapper. The expert noted that because of the design of the gun, one's finger naturally tended to rest on the trigger when the gun was drawn. Ratliff testified that he normally placed only five shells in the cylinder and allowed the hammer to rest on the sixth empty chamber. The gun was so designed that when the trigger was pulled the cylinder would rotate to bring a live round into the chamber. It seems clear that the fatal shot resulted from the trigger actually having been pulled.

## II. *The Case Against Ratliff.*

■ In accordance with prevailing law, the district court, in enunciating the rules of law for the jury (which for the purpose of this appeal have become the law of the case), instructed that Ratliff, having killed Russ, assumed the burden of justifying his act. The court further instructed that under state law Ratliff might "use such physical force as may have been necessary to enforce compliance by Carnell Russ with proper instructions and to protect other persons, including himself, from physical harm at the hands of Carnell Russ." The court further advised the jury that Ratliff would

---

6. It must be borne in mind that Draper and Green were both defendants charged, *inter alia,* with failure to intervene in the altercation. Draper had the defense that he was not an officer and had no duty towards Russ. Green's primary defense was that he did not have an

opportunity to prevent Ratliff from shooting Russ.

7. Ratliff's own gun was not available for testing because he sold it after the shooting. He could not provide the name of the purchaser.

not be liable unless he "used more or greater force or means on the decedent, Carnell Russ, then would have appeared to a reasonable person, in like circumstances, to be necessary in order to accomplish the lawful purpose or purposes intended."

Under any version of the incident,[8] the police officer, Ratliff, who struck Russ with a pistol and then shot him, whether accidentally or otherwise, must be held to have used excessive force upon his prisoner. Ratliff does not claim that he was in danger of personal harm from Russ' ineffectual swinging, if, indeed, any occurred. Before drawing the pistol and while using only his fists, Ratliff claims he had knocked Russ back against the wall on two occasions. Ratliff did not turn to Trooper Green and request assistance and there is no claim that Russ was seeking to escape.[9] Indeed, Ratliff's testimony demonstrates that he easily handled Russ' ineffectual alleged fisticuffs. Draper's testimony indicated he was available to assist Ratliff in subduing Russ. Ratliff, in addition to asking for personal assistance from Green or Draper, could have asked Green for his can of mace.[10] Ratliff's own testimony establishes that he was in complete control of Russ without drawing his weapon. Indeed, the only reason that Ratliff gave for drawing his weapon was because in Ratliff's words, "I wasn't paid to stand and fistfight nobody, so I used my gun as a slapper." Moreover, the evidence discloses that Ratliff handled the weapon in a ready-to-shoot position, with finger on the trigger.

We can find no evidence that Ratliff needed to draw his gun for his self-defense or to control the prisoner. Since no justification existed for Ratliff's use of a pistol against the prisoner, we cannot under the circumstances of this case allow the jury verdict to stand.

This court is mindful that a jury's verdict in cases of this kind ought not to be overturned without sound and good reason. Mrs. Russ is not entitled to judgment n. o. v. unless reasonable minds, viewing the evidence in the light most favorable to appellee Ratliff, could only have found in her favor. *Griggs v. Firestone Tire and Rubber Co.,* 513 F.2d 851 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Yet, if the applicable section of the Civil Rights Act, 42 U.S.C. § 1983, is to have any meaning [11] in the face of these aggravated circumstances, the jury's verdict exonerating Ratliff cannot be permitted to stand. Under similar and somewhat less aggravated circumstances, the courts have not been adverse to awarding damages against police officers who used excessive force against a prisoner either in firing a pistol or otherwise. *See Aldridge v. Mullins,* 474 F.2d 1189 (6th Cir. 1973); *Jenkins v. Averett,* 424 F.2d 1228 (4th Cir. 1970); *Smartt v. Lusk,* 373 F.Supp. 102 (M.D.Tenn.1972), *aff'd,* 492 F.2d 1244 (6th Cir. 1973); *cf. Jennings v. Davis,* 476 F.2d 1271 (8th Cir. 1973).

We recognize that Ratliff appeared *pro se* in the trial of this case in the district court. We note that the plaintiffs-appellants did not move for a directed verdict until after the trial court had already instructed the jury, and the motion then made sought a directed verdict against both Ratliff and Green. As we demonstrate below, the motion was clearly not well taken as against

---

**8.** In response to a motion for a new trial to review the record or judgment n. o. v., we review the record most favorably to the appellee.

**9.** Ratliff contends that Green panicked and "just stood there froze."

**10.** Ratliff testified that Trooper Green carried a can of mace that day although Green was not certain that it was on his person. In any event, there was mace in Green's car and the facts show no emergency which would have precluded Green from obtaining the mace.

**11.** Section 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Green. Thus, the record does not clearly reflect Mrs. Russ made a proper motion justifying a directed verdict solely against Ratliff. Under all these circumstances, in reversing the case against Ratliff, we remand for a new trial on all issues, and reject Mrs. Russ' demand for judgment n. o. v.

### III. *Other Issues.*

■ The evidence supports the jury verdict in favor of Green. Green testified that the entire incident lasted only a few seconds and that he was "stunned" at Ratliff's actions in drawing and firing the gun. Accordingly, the district court committed no error in refusing to disturb the jury verdict dismissing appellants' claims against Trooper Green.

■ The district court also properly dismissed the action against Draper. Draper was not yet a city policeman but retained the status of a private citizen. Thus, his conduct did not amount to state action. No basis existed for recovery under § 1983. *See Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Even if pendent jurisdiction had attached, the record is barren of showing any unlawful or negligent conduct on Draper's part in the events leading up to the death of Russ. Although available on the scene, Draper assumed no duty to protect Russ from Ratliff.

■ The record is also bare of any evidence on which to attach liability to the city councilmen. No witness testified that any councilman acquired any specific knowledge of Ratliff's propensities for violence to and maltreatment of persons under arrest.

We also agree with the district court that the plaintiff failed to make out a prima facie case against Mayor Thomasson. Only one witness testifying on behalf of the plaintiff said that he had complained to the mayor of Ratliff's brutality. One William Thomasson (apparently no relation to May-

or Thomasson) testified that Ratliff had arrested him for driving while intoxicated in February of 1971, and that following the arrest, Ratliff drew his service pistol and struck him across the head three times. Mayor Thomasson learned of this alleged conduct while sitting in a judicial capacity trying William Thomasson on the DWI charges. At trial before Mayor Thomasson, Ratliff and William Thomasson told conflicting stories. Apparently Mayor Thomasson weighed the credibility of the two witnesses and accepted Ratliff's version of the events. In light of subsequent events, Mayor Thomasson may have made an incorrect choice on credibility, but having decided to believe Ratliff rather than the arrestee, Thomasson, the Mayor cannot be said to have acquired knowledge, as alleged in the pleadings, that Ratliff "had established a record and reputation for the propensity and tendency of violence and maltreatment of prisoners arrested by him  *  *  * ."

We do not suggest that under other circumstances a single notice to an appropriate city official charging a police officer with brutality may be ignored with impunity. Here, however, Mayor Thomasson received information of Ratliff's alleged brutality in judicial proceedings. Ratliff testified to the contrary. The mere assertion of the brutality charge, without corroboration, is not enough to impose liability upon Mayor Thomasson for Ratliff's unlawful act. *Cf., Chestnut v. Quincy,* 513 F.2d 91 (5th Cir. 1975); *Jennings v. Davis,* 476 F.2d 1271 (8th Cir. 1973).

Accordingly, we reverse and remand this case to the district court for a new trial against appellee Ratliff in conformity with this opinion.[12] Otherwise, the judgment stands affirmed.

---

12. Appellants have also objected to the assessment of expert witness fees requested by the Arkansas State Medical Examiner. On review of the record, we are satisfied that the order requiring appellants to pay the fee of $122 rested within the trial court's discretion and we will not disturb it on appeal.