Steven **KAYSER**, Appellee,

v.

**ROCKWELL GRAPHIC SYSTEMS, INC.**, Appellant.

No. 81–1252.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1981.

Decided Jan. 5, 1982.

Rehearing and Rehearing En Banc Denied Feb. 16, 1982.

---

12. Tr. 427–28.

13. Tr. 446–47.

Robert R. Schwarz (argued), Daniel P. Card II, St. Louis, Mo., for appellant Rockwell Graphics, Inc.

Larry W. Glenn, St. Louis, Mo., for appellee Steven Kayser.

Before ROSS and STEPHENSON, Circuit Judges, and WOODS,[*] District Judge.

STEPHENSON, Circuit Judge.

Defendant-appellant Rockwell Graphic Systems, Inc. (Rockwell)[1] appeals the district court's[2] denial of its motions for directed verdict and judgment notwithstanding the verdict (J.N.O.V.) in this products liability case in which the jury awarded plaintiff-appellee Steven Kayser $40,000. Rockwell argues its motions should have been granted because Kayser voluntarily subjected himself to a known risk and hazard and because Kayser failed to present a submissible case that the printing press, as designed, was unreasonably dangerous when used as reasonably anticipated. We affirm the district court.

## I. BACKGROUND

In July of 1977, after working three and one-half years in Universal Printing's bindery department, Kayser became an assistant pressman in the company's letter press department. He had no previous experience working on a letter press. Kayser's duties as assistant pressman were to bring paper into the pressroom, to stack the paper in the letter press and to keep the press, a machine approximately thirty feet long, running continuously. If the press would stop running, he was responsible for finding the problem and getting the press going again as soon as possible. The press's operating manual states that uninterrupted operation and simple rapid adjustment are of "prime importance" because at the press's speed (1,500–2,500 sheets per hour) "even short stops mean the loss of many printed sheets."

The press was designed to shut off automatically when one or more of the sheets moving through it become jammed, misguided or crooked. Once the press stopped automatically, to restart it the reset peddle would have to be pushed and then the start button pushed. The press was also equipped with an inching button which allows the machine to run as long as the button is held in and when the button is released the press rolls to a stop.

The inch button had been used by Kayser in situations where the press had stopped and the problem paper was in one of the three press cylinders. Kayser would inch the press forward until the sheet became visible and would then pull as much of the sheet off the cylinder as possible. After that he would start the press running and when the remainder of the problem sheet was picked up by the gripper bar, he would pull the gripper release knob which caused the gripper bar fingers to open and the paper would then drop into the bottom of the delivery pathway. The gripper bar has to be in a certain position before a pull on the release knob will release the sheet of paper. It was then necessary to remove the problem paper from the pathway because it

[*] The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

[1] The original defendant was Miehle Printing Press and Manufacturing Company. On February 9, 1981, Rockwell, as a successor corpora-

tion, was substituted as defendant by the court with consent of the parties.

[2] The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri. There is no written opinion by the district court.

could be pulled back up into the cylinders by static electricity or could be pulled along the delivery pathway by other non-problem sheets causing them damage.

During the six weeks Kayser worked on the letter press before his injury, he received no training or instruction on removal of the problem sheets when the press automatically shut off. Several times Kayser had observed a co-worker, Michael Kalinowski, remove a problem sheet without incident from the delivery pathway by standing on the operator's platform and reaching over the unguarded top of the delivery pathway. Kalinowski would time his reach between the moving gripper bars and pick up the problem sheet from the bottom of the delivery pathway.

The other method used by the Universal employees to retrieve a problem sheet from the bottom of the delivery pathway was to stand on the floor and reach under a screen that runs along the side of the delivery pathway. When using that method the gripper bars would be running above the hands of the person reaching in from underneath. Kalinowski had seen a co-worker's hand scraped and struck by the gripper bars when he attempted this method of removing the problem sheet.

On August 26, 1977, approximately two hours after Kayser started working, the letter press shut off automatically. The machine had been running at 1600 to 1800 sheets per hour. Kayser ran from the feeder end of the press, got on the operator's platform and checked to see if the sheets were still coming down into the guides. After ensuring those sheets were straight, he pushed down the reset peddle and started the press. He moved over to the gripper release knob, pulled it, and the problem sheet dropped into the bottom of the delivery pathway. He reached with his left arm over the side screen into the delivery pathway to retrieve the problem paper; however, his left arm was struck by a gripper bar and was severely injured.

Kayser's products liability suit against Rockwell was tried to a jury on February 9, 1981, on the theory of strict liability in tort. The jury awarded Kayser $40,000 and the court entered a judgment for that amount on February 10, 1981.

## II. ANALYSIS

### A. Contributory Fault

Missouri law recognizes the affirmative defense of contributory fault for a case based on strict liability. *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 363, 366 (Mo.1969). This defense requires proof that the plaintiff knows the facts which create the danger and proof that he comprehends and appreciates the danger itself. *Williams v. Ford Motor Co.*, 454 S.W.2d 611, 619 (Mo.App. 1970). Rockwell argues that its motions for directed verdict and J.N.O.V. should have been granted because Kayser's own testimony proves the defense of contributory fault since it reveals that he voluntarily exposed himself to a known risk and hazard.[3] *See Collins v. B. F. Goodrich Co.*, 558 F.2d 908, 911 (8th Cir. 1977).

Rockwell carries a heavy burden in its attempt to overturn the jury's verdict for Kayser. "A verdict may be directed or a jury verdict overturned 'only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party.'" *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 250 (8th Cir. 1978) (quoting *Giordano v. Lee*, 434 F.2d 1227, 1231 (8th Cir. 1970) (emphasis in original)). Rockwell is not entitled to a J.N.O.V. unless reasonable minds, viewing the evidence in the light most favorable to Kayser, could only have found in its favor. *Russ v. Ratliff*, 538 F.2d 799, 804 (8th Cir. 1976).

Contributory fault is ordinarily a jury issue and in this case we cannot conclude that Kayser was contributorially at fault as a matter of law. *See Hoppe v.*

---

**3.** Rockwell relies on several portions of Kayser's testimony, all of which have the same thrust as the following example.

[Attorney]: You knew if you stuck your hand in there and you didn't get it out before

they came around they would hit you; didn't you?

[Kayser]: Yes, if I didn't get it out in time.

**1236** 

Midwest Conveyor Co., 485 F.2d 1196, 1201 (8th Cir. 1973); Higgins v. Paul Hardeman, Inc., 457 S.W.2d 943, 947–49 (Mo.App.1970). The evidence reveals that Kayser had no previous experience on the press, received no training on the removal of problem sheets and had only worked on the press for six weeks before his injury. At the time of the accident, the press was running at a slower speed, 1600–1800 sheets per hour. Additionally, on several different occasions Kayser had observed a co-worker use the same procedure to solve the same problem without receiving any injury. Therefore, the evidence does not point all one way and reasonable minds can differ as to whether Kayser knew and appreciated the true risk and danger involved in attempting to retrieve the problem sheet in the manner he used.

### B. Unreasonably Dangerous Design

██ Missouri recognizes liability for faulty design. Higgins v. Paul Hardeman, Inc., supra, 457 S.W.2d 943. Where, as here, a plaintiff's theory is based on the dangerous design of a highly complicated piece of machinery, expert testimony is appropriate. Hoppe v. Midwest Conveyor Co., supra, 485 F.2d at 1202. Kayser's expert, Dr. Gerald Dreifke, testified that in his opinion the letter press was unreasonably dangerous. Dr. Dreifke stated that the design was faulty because there was no guard over the top of the delivery pathway to prevent access by the operator of the machine. This additional guard could have been hinged and equipped with an innerlock device to automatically stop the press when opened. Additionally, he testified that the gripper bar release system could incorporate an innerlock switch to automatically stop the machine when the knob is pulled and the sheet is dropped into the delivery pathway. Dr. Dreifke's opinion was that both safety modifications would be of relatively modest cost and both would be technilogically feasible.

██ Despite this evidence, Rockwell argues that its motions for directed verdict and J.N.O.V. should have been granted because Kayser failed to present a submissible case that the press, as designed, was unrea-

sonably dangerous when used in a manner reasonably anticipated. However, Rockwell presented no expert testimony. Rockwell did not rebut Kayser's expert's testimony that the press was unreasonably dangerous and that the hazard could easily have been avoided by the erection of a guard. This evidence made a submissible case for the jury. Rockwell has not met the heavy burden required to overturn a jury verdict. We affirm the district court.

ROSS, Circuit Judge, dissenting.

I would reverse the decision of the trial court and remand with directions to grant the motion to enter judgment N.O.V. In my opinion there is no question but what plaintiff deliberately reached over a guard fence and stuck his hand into the press knowing full well the danger involved and knowing also that the inching button on the press could be utilized to safely correct the problem. This case illustrates the ridiculous state of the products liability law in most states. It is difficult to understand how a defendant can ever defend such a case when, as here, the plaintiff's own negligence clearly was the cause of the accident.