**Mary GRANT, Trustee for the heirs of Gregory Grant, deceased, Plaintiff,**

v.

**Jeff VOLLMAN, Defendant.**

**No. Civ. 5–78–60.**

United States District Court, D. Minnesota.

Feb. 11, 1981.

MacDonald & Munger by Harry L. Munger, Duluth, Minn., for plaintiff.

Hanft, Fride, O'Brien & Harries, P.A. by Edward T. Fride, Duluth, Minn., for defendant.

## MEMORANDUM

MILES W. LORD, Chief Judge.

### INTRODUCTION

The accident which served as the basis for the above-entitled action happened on June 3, 1977, when the plaintiff-decedent suffered fatal injuries while on a commercial slide in a small amusement park, near the Duluth Zoo. The pavilion near where the slide stood, the parking lot at the Zoo, and a bandstand behind the pavilion frequently served as a gathering place for teenagers and young adults from the West End of Duluth.

On the night in question, approximately 100–200 young people congregated in the above area. During the evening, plaintiff-decedent, who was then 22 years old, and another man climbed to the top of the slide

on the steel crossmembers which supported it. In the course of his first descent, plaintiff-decedent struck a chain placed across the slide by the defendant, or his agent, causing his thorax and head to fly backwards, striking the structure and resulting in fatal injuries. The physical cause of death was not in issue.

### DISCUSSION

I. *The Jury Issues*

The Minnesota Jury Instruction Guide (JIG) Rules regarding "Duty of Possessor to Trespasser—Injury Caused by Condition of the Premises," are as follows:

JIG II, 326 G–S DUTY OF POSSESSOR TO TRESPASSER—INJURY CAUSED BY CONDITION OF THE PREMISES

A possessor of land is under no duty to a trespasser to maintain his premises in a reasonably safe condition.

If, however, a possessor of land knows or from facts known to him has reason to know that trespassers regularly use certain portions of his premises and if he creates or maintains an artificial condition on his premises which he knows is likely to cause death or serious bodily harm, and which is such that he has reason to believe that trespassers would not discover it, then he has a duty to use reasonable care to warn a trespasser of the danger or risk involved, unless the trespasser is already aware, or from facts known to him should have been aware, of the condition of the premises and the risk involved.

The principal fact issues submitted to the jury for decision on liability were whether or not the defendant, who was admittedly the possessor of land, having created an artificial condition, knew trespassers would be present and gave the necessary warnings required under the law.

▆ The overwhelming evidence, apparently accepted by the jury in this case, was to the effect (1) that the defendant was well aware that young people were frequently trespassing upon the slide; (2) that

he created an unreasonably dangerous condition by placing a single chain across the slide in a low place, behind a hump, not visible to one standing at the top of the slide preparing to descend and (3) that the warnings given to trespassers were not adequate under the circumstances.

Defendant does not seriously dispute the proposition that fact issues were presented for the jury to decide regarding his negligence and the contributory negligence of the plaintiff-decedent. This case is squarely analogous to *Hanson v. Bailey*, 249 Minn. 495, 83 N.W.2d 252 (1957), where the Minnesota Supreme Court held:

> Whether a contractor in lawful possession of a road construction zone has given a reasonably adequate warning of construction hazards to trespassing motorists whom he knows, or reasonably ought to know, will enter the construction zone, despite conspicuous "Road Closed" signs at the zone's terminal, is usually a question of fact for the trier of fact.

The jury found that under the law and circumstances, defendant Vollman was 70% negligent and the plaintiff-decedent 30% negligent. This Court believes that finding is totally justified, and judgment was properly entered for plaintiff.

A. The Defendant's Knowledge of Trespassers.

The defendant testified that he had a good deal of trouble with young people coming into his amusement park, located on land leased from the City of Duluth. Once on the premises, he testified, the trespassers used his equipment, causing some damage. He in fact was so concerned about the problem that either 2 or 3, or 3 or 4 (testimony varied) times a night he came by the area to make sure that no one was trespassing. Moreover, the defendant, by his own testimony, claimed that he had discussed the slide in the presence of the plaintiff-decedent an hour or two before the accident, and had warned him and his friends not to go on the slide because "It's chained, locked, barbed wire, and they can't go down the thing anyway."

From these facts alone, the jury could find that the defendant knew of the trespassers, and that having created an artificial condition that could cause injury, he failed to give adequate and proper warning. Expanding the horizon to include other evidence and testimony fortifies this conclusion. Looking at the evidence as a whole, one can arrive at no other conclusion than that the defendant expected trespassers to enter his property frequently and to use the slide. Nevertheless, he created an artificial condition that could cause serious injury, a hazard that he could reasonably anticipate would not be discovered by the trespassers.

Throughout the trial, there was a good deal of conflict in the testimony. One of the conflicts, relevant to the foreseeability of trespassers, was whether or not there was an 8' perimeter fence in place at the time the young men climbed up the slide. Defendant contended that such a fence was completed and in place at the time, but several other witnesses testified to the contrary. Some of them included the people who were engaged in putting up the fence. The prime contractor for the fence had no independent recollection of what had transpired, but he did come to Court with one document which might have indicated that the fence was up at the time of the accident. However, he said he would defer to the judgment of those who put up the fence, and of those present at the scene who had already testified that the fence was not up at the time of the accident.

The presence or absence of the perimeter fence bore primarily upon the questions of whether or not the defendant could reasonably anticipate trespassers and the kind of warning needed. The defendant, however, took care of any doubts about the foreseeability issue in his own testimony when he indicated that trespassers could be expected, that he expected them and that he was patrolling the premises regularly to keep them out.

Nonetheless, the existence or non-existence of the fence can still be utilized by the jury for two related purposes: 1) to establish the credibility or non-credibility of the

various witnesses, specifically including the defendant who was the only person claiming a firm recollection of the fence's presence at that time; and, 2) assuming a decision in favor of the non-existence of the perimeter fence, to impair defendant's claim of reasonable notice of the danger of the chain by placement of various warning signs. In that regard, the investigating officer testified not only that there was no perimeter fence, but also that there was only one visible sign. The sign said only, "No Trespassers, Violators will be Prosecuted." As is more fully discussed below, this is certainly no warning as to the artificially created danger.

Thus, the three elements that give rise to the duty to warn under the Jury Instruction Guide are present. The defendant was a possessor of land, he anticipated frequent trespassers on the slide, and he created an artificial condition (the chain) which was hidden from view and was extremely hazardous to the very people he expected to enter his property and use the slide.

B. The Defendant's Duty to Warn.

I next turn to the defendant's duty to warn under these circumstances. When the jurors visited the area for a view, they found the one acre area completely surrounded by a chain link fence 8' high with three rows of barbed wire on top. At each area of the fence and at each corner were large red and white signs saying "No Trespassers." Inside of the perimeter of this fence was a smaller fence, which effectively sealed off the bottom end of the slide. As access to the slide itself was through this smaller fence, there was a locked gate. On the day of the viewing, the jury observed a sign on the gate which said, "Danger—This slide is locked and chained for your protection nightly."

Reading the sign, assuming for argument's sake that such a sign existed at the time of the accident, a trespasser would certainly be warned that there was a fence with a gate and that the gate was chained with a lock on the chain. All of these things were observable as the jurors stood and looked at the gate and the sign thereon.

The sign, however, contained no warning that chains had been placed across the slide itself. Thus, even if the signs were present, it could well be found to constitute an inadequate warning of the actual danger faced. Yet, if the warning sign were there and the fence locked and chained, it would indicate an awareness on the part of the defendant that trespassers would be inside of the outer perimeter fence and would be seeking to use the slide.

Therefore, even if the sign were present on the night of the accident, there would be no specific warning of the unreasonably dangerous condition created by the landowner when he stretched a chain across the slide itself. In addition, the evidence offered ample basis for the jury to have concluded that no sign was in place on the night of June 3, 1977. Officer Johnson himself stated that he saw no sign. The defendant testified otherwise about the existence of this sign, the fence, and several other matters on which the jury could conclude that he was thoroughly impeached.

The defendant, whose credibility might reasonably have been questioned by the jury, testified that only a few minutes before the accident, he had gone to the particular van occupied by the plaintiff-decedent and warned the plaintiff and others in the van "to stay out of there because 'It's chained, locked, barbed wire, and they can't go down the thing anyway.'" The defendant told them that if they would promise not to slide down the slide or go into his amusement area, he would promise not to call the police. He did not specify what basis he might have for calling the police other than perhaps his belief that the presence of all these young people in this public area near his privately-operated amusement park called for police action. The question as to whether or not this admonition constituted sufficient warning to known trespassers was a jury question, and one which this Court thought preponderated heavily against defendant's contention that he used reasonable care to warn trespassers of dangers involved. Defendant, despite consider-

able examination by his own attorney, plaintiff's counsel, and the Court, never specifically testified that he told the plaintiff that there was a chain across the slide. It was only after lengthy cross-examination that he added to his several previous statements the ambiguous admission "and they can't go down the thing anyway."

## C. The Comparative Negligence of Plaintiff and Defendant.

The Court concluded that neither climbing over the fence (if it was erected) nor climbing the steel supports was the direct cause of the injury to plaintiff-decedent, but rather that the act of negligence, if any, on the part of the plaintiff-decedent consisted of his decision to make the slide down the hill in the darkness or semi-darkness. Defendant's counsel, despite admonitions from the Court, persisted in arguing that plaintiff-decedent's contributory negligence could be demonstrated by indicating the height of the fence and the reckless climb which the young man and his companions took in arriving at the top of the slide. Many pages of transcript were spent in describing these matters, which the Court felt had no bearing upon the actual issues regarding liability. It was for that reason that the Court, in order to focus the jury's area of inquiry, stated that the time when the contributory negligence, if any, took place was at the time the men stood on top of the slide contemplating whether to slide down, with the information they then must have possessed about the presence or absence of chains and lighting, and with whatever other knowledge the jury could infer decedent had or reasonably should have had.

The defendant in his testimony maintained that there was no semidarkness but that a giant spotlight on top of the slide lighted up the area. This spotlight, he claimed, was destroyed by the plaintiff or someone else in the few minutes before or at the time of the fatal injuries. All of the other evidence in the case indicated that no such light existed; nor was there any evidence that a damaged spotlight was present on the premises that evening. The basic argument over how light or dark it was is critical to the determination of whether or not the plaintiff-decedent knew or should have known that a chain was across the slide.

Certainly, if the jury had found that it was as light as the defendant said it was and that two sets of double chains were across the slide in the position which he claimed, the plaintiff-decedent would probably have been more negligent than the defendant, and no recovery could be had under Minnesota law. This is exactly what the jury was instructed over protest by plaintiff. In the Court's view of the evidence, the plaintiff proved by an overwhelming preponderance of the evidence that there was only one chain across, that it was at the bottom of the steepest hump in the slide where the maximum velocity would be attained, that it was approximately 1–2 feet above the surface of the slide and that it could not be seen by a person standing at the top of the slide no matter how bright the light.

Apparently because of insurance coverage problems, no one suggested that the placing of the chain at that place, while anticipating users during nighttime hours, would constitute an intentional tort or crime. The evidence did show, however, that immediately after the accident the defendant came to the scene, and upon learning of the injury to the plaintiff-decedent said, "I hope the son of a bitch croaks."

The evidence would justify a finding that the chain was intentionally set to punish the trespassers in just the manner, though perhaps not to the same degree, that the plaintiff-decedent encountered. Merely because a plaintiff's counsel does not choose to make the formal charge and to offer complete proof that a wilful and wanton tort occurred does not automatically outlaw any evidence which would tend toward that end. The physical circumstances surrounding the accident, and the actions and attitudes of defendant, by his own testimony, amply demonstrate the aura of hostility that surrounded this event. This atmo-

sphere culminated in the defendant's statement that he hoped "the son of a bitch croaked" and the ultimate realization of his expressed wish. Defendant admitted he made this statement but did not explain it or justify it to the jury.

In light of the failure of the defendant to satisfy his duty to warn trespassers of the dangerous artificial condition he had created, the record evidence offers substantial support for the jury's determination.

## II. *The Post-Trial Motions*

Defendant also moves in the alternative for a new trial or remittitur. The Court was not presented with any sound argument or reason to hold the verdict excessive and therefore concludes that the motion for remittitur is not well taken. The grounds cited for a new trial are basically directed to comments, instructions and questioning by the Court, and a conversation between the Deputy Marshal (bailiff) and the jury forewoman.

### A. Comments, Instructions and Questioning by The Court.

Insofar as the objections to the Court's comments or interrogations of the photographer are concerned, the pictures were proffered by the defendant, and the defendant's exact purpose in bringing these pictures into play was never made clear. The best information that the Court had with regard to the reason for the introduction of the pictures was that the photographs revealed that the light was so bright at the scene of the incident that the decedent, had he looked, would have seen the chains, had they been in the position claimed by the defendant.

While pictures of this type might be helpful to demonstrate where a particular shadow fell or what area was lighter or darker than another, they are of very little use in demonstrating the detail of objects that would have been seen by the human eye under natural conditions. Their reliability concerning actual conditions was seriously reduced by other testimony, including that of Officer Johnson.

Upon the Court's inquiry of the photographer, Mr. Jesperson, it developed that the cameraman made the pictures with several different times and exposures in order that a whole range of pictures would be available, each one depicting a different amount of light. By moving any of the several adjustments on the camera, the visual image can be sharpened, and the detail can become more or less apparent. The Court inquired of the photographer as to whether or not each f-stop on the camera doubled the amount of light available to its impression upon the negative plate. The cameraman agreed that, other things being equal, the f-stop would have that effect. The Court's examination was made in aid of defendant's proffer of the photographic exhibits and in order to put them in proper perspective.

While the photographer would ordinarily have been allowed to testify that the particular pictures which he had selected were those which most closely represented the actual lighting, he did not do this. It appears that the photographer sent a series of pictures depicting a scale of lighting from very dark to very light to defendant's counsel, and that Mr. O'Brien, one of the law partners of Mr. Fride, made the selection as to just which pictures should be introduced into evidence. Mr. O'Brien was not called to the stand, and the witness was never asked how the pictures proffered by defense counsel compared with the actual lighting as he saw it at the time. Defendant's counsel never gave any explanation or proffered any testimony as to why the particular pictures were selected. It is the Court's belief that the transcript will show, that absent the questioning of the Court, there was absolutely no such testimony offered. The Court's questions developed that Mr. O'Brien could have laid foundation, had he been available, or that the witness himself could have laid foundation; but this was not done.

Defendant's counsel's complaint seems to be that the Court was helping him to get an exhibit into evidence without having foundation. Defendant's counsel also was al-

lowed by the Court to place in evidence, without foundation, some posed photographs taken by his investigator which purported to show the chains in what he alleged to be their regular place across the slide.

■ It is generally thought that the better rule would require that defense counsel make some contemporaneous objection to offensive language of the Court or ask for some corrective instruction; he has not pursued either course here. The record will indicate that upon each occasion when such objection was made by Mr. Fride, the Court scrupulously accommodated him by issuing corrective statements. In fact, at the close of the Court's instructions, Mr. Fride was asked if he had anything to add or any objections, and he said that he did not. Even assuming that something which was said by the Court might have been construed to prejudice Mr. Fride's client, which is not for a moment conceded, Mr. Fride should properly be held to have waived it, because he at no time moved for a mistrial.

It is difficult for a trial court to preside over a case in which defense counsel expresses agreement with everything that is done in response to his suggestions, registers no objections, and then appeals from the very things which he apparently agreed to.

The defendant makes complaint of the Court's interrogation of a sixteen year old witness named James French. Counsel states that Mr. French became anxious and emotional and was under great stress. It is the Court's observation that any witness who testifies under the conditions of this case is apt to become emotional and appear to be under stress. The witness was requested to give testimony of experiences which he did not have and to make observations which he could not have made under the circumstances. In response to leading questions by counsel, the witness responded that he had "put up" chains across the slide in a certain manner for a year when he worked at the park before the accident. It later developed that he had not worked at the park for a year and that he had only worked there, at most, a few hours on days before the accident. It is likely that full-time employment there did not commence, if at all, until seven days after the accident. This confused and sometimes incoherent witness gave two versions of everything and ultimately, in response to cross-examination by plaintiff's counsel, admitted that he knew very little, if anything, about most of the matters to which he testified.

■ Insofar as defendant's request for an instruction on the effect of income taxes on the award, it is the Court's feeling that in a diversity case in this jurisdiction, the law is settled: Such a request must be denied. Nevertheless, it seems important to note that on some special personal injury cases this Court has asked the statistical experts to compute the award both with and without income tax, and there has been very little difference in the results.

The plaintiff has requested that this Court add prejudgment interest. The granting of such interest would, I am sure, foreclose the kind of frivolous appeal that is here made. Interest on $250,000 at the average rate from the accident to the date of this writing, and in addition, for the approximately one year it will take to appeal, comes to almost $50,000; this would pay for a lot of transcripts and attorneys' fees on appeal. This Court must, however, decline plaintiff's motion, leaving the fate of prejudgment interest to be determined either on appeal of this case or by decisions in other cases currently on appeal.

### B. The Marshal's Communication to The Jury.

■ Defendant's counsel has cited as a basis for his motion for a new trial a comment made by the Marshal to one of the jurors. A description of this incident is adequately covered in the briefs and in the transcript. It does not appear to this Court that any other action or answer would have been appropriate by the Marshal under the circumstances, at that time of day, in answer to the request given him. Wayne Ruud is an experienced and conscientious U.S. Marshal. He is intelligent enough to know that any questions calling for legal advice should be referred to the Court. The

question asked of him was so simple and the answer was so obvious that Mr. Ruud advised the jury to go back to work and to answer the questions. It might have been better had this been handled otherwise, but it seems to be very unfair for a defeated defendant in a civil case to be able to raise questions where form absolutely predominates over substance. The Marshal gave the only possible answer that could have been given the jury under the circumstances. This is obviously the answer that the Court would have given. The record also shows that almost immediately Mr. Ruud asked jurors to put all questions in writing, which invitation was obviously ignored by the jury.

### CONCLUSION

The consequences of granting a new trial under such circumstances would be to penalize this young widow to the extent of several thousand dollars in additional expense and to enrich the defendant by allowing him to invest the amount at issue for an additional period of time. When taken by its four corners, if this were not a fair trial and a fair result, it is difficult for this Court to imagine what would constitute one. The motions of defendant are denied in all respects.