David CRYTS, Plaintiff-Respondent,

v.

FORD MOTOR COMPANY and Robert Uttendorfer, Defendants-Appellants.

Nos. 39158, 39159.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 8, 1978.

Motion for Rehearing and/or Transfer
Docket #39159 Denied
Sept. 15, 1978.

Application To Transfer Docket #39159
Denied Nov. 6, 1978.

684

Richeson, Roberts, Wegmann, Gasaway, Stewart & Schneider, Mark T. Stoll, R. A. Wegmann, Hillsboro, for defendants-appellants.

Ely & Wieland, Robert C. Ely, St. Louis, for Ford Motor Co.

Schurr, Inman & Graziani, Robert L. Inman, Clayton, for plaintiff-respondent.

GUNN, Presiding Judge.

This appeal arises from a civil action in tort based on a two car collision in which plaintiff, David Cryts, suffered paraplegia. The jury returned a verdict in the amount of $150,000, and the judgment was entered against defendants Ford Motor Company (Ford), the manufacturer of the car plaintiff was driving, and Robert Uttendorfer, the driver of the car with which he collided. Uttendorfer's liability is premised on negligence in the operation of his vehicle, while Ford's liability is premised on strict liability for a defectively designed armrest which caused plaintiff's back to be broken when he was thrown against his door in the collision. Each defendant has appealed. Ford argues that the armrest in question was not defective as a matter of law; that regardless of any alleged defect it cannot be held liable for injuries sustained in a collision when the cause of the collision is unrelated to the injury producing defect. Further, Ford and Uttendorfer argue that the verdict directing instructions were improper. Uttendorfer also urges that the trial court erred in refusing to permit the jury to view a film of the scene of the accident. We find no error and affirm the judgment.

The accident occurred in Jefferson County on June 3, 1967 at approximately 2:00 P.M. The weather was warm and clear. Uttendorfer was northbound on the two lane access road adjacent to Interstate 55 near his home on Maple Lane. Plaintiff, who was nineteen at the time, was southbound on the same road driving a 1957 Ford Thunderbird which he was taking to his home for repair. Immediately south of Maple Lane the access road is straight and flat. To the north the road is also straight, but there is a dip about 640 feet from Maple Lane which impairs the ability of northbound drivers to see oncoming traffic. Plaintiff first saw Uttendorfer's vehicle when it was approximately one quarter mile away. When both cars were about 150 feet from Maple Lane, plaintiff noticed Uttendorfer's car edging into the wrong lane. Plaintiff took his foot off of the accelerator but did not begin to brake until he saw that Uttendorfer had moved completely into the southbound lane of traffic. At that time he applied his brakes hard, causing his car to skid, and he steered left into Uttendorfer's lane of traffic. At the same time Uttendorfer saw plaintiff and swerved back into his proper lane. The two cars collided at the intersection of Maple Lane in Uttendorfer's lane of traffic. On impact, plaintiff was first pitched forward and right, then back into the armrest. He felt an excruciating pain in his back and was unable to move his legs to apply his brakes. Plaintiff went crashing into a chain link fence to halt the movement of his car.

A state trooper who arrived at the scene shortly after the accident occurred measured plaintiff's skid marks and estimated his speed to have been 50–60 m. p. h. Uttendorfer's car left no skid marks, but his speed was estimated to have been 5–15 m. p. h. Uttendorfer told the trooper that he was preparing to turn left into Maple Lane when plaintiff's car suddenly appeared, prompting him to swerve left. At trial he denied ever crossing into the wrong lane of traffic.

Plaintiff was taken to a hospital after the accident. He was found to have suffered a broken back resulting in permanent paraplegia. An orthopedic surgeon who treated plaintiff testified that the trauma to the spine was caused by an object striking him in his back. He was unable to state unequivocally that the armrest in the 1957 Thunderbird was the crippling object.

Plaintiff relied on the testimony of Wallace Diboll, associate professor of mechanized engineering at Washington University, to establish the defective condition and design of the Thunderbird's armrest. Diboll testified regarding his studies of methods of energy absorption to lessen the effect of second collisions—the first collision being between the automobile and another object and the second collision being between the automobile's occupant and a part within the automobile. Diboll concluded that there are two basic methods of energy absorption. The first requires the use of padded materials within the vehicle's interior to absorb energy by distributing the force of impact over an area rather than a concentration at one point. The second method would be to remove any protruding or sharp objects, thereby avoiding concentration of high stress energy at a narrow point. Mr. Diboll testified that his examination of the Thunderbird armrest revealed that it was manufactured from hard plastic with minimal energy absorption capacity and that the thickness of the prophylactic padding over the plastic was only .11 of an inch. He found further that the armrest's pointed shape did not provide a good distribution of force but concentrated energy absorbed by the body. Mr. Diboll stated that there were current designs which would be more effective in lessening the potential for second collision injuries.

Ford presented evidence concerning the safety of the design and condition of its 1957 Thunderbird. Ford's witness testified that the purpose of the Thunderbird armrest was to provide a handle to close the door, to serve as an armrest and, in a collision, to prevent the driver from making contact with the car door hardware. The Ford expert testified that the alternative armrest suggested by Mr. Diboll would not provide these functions nor conform with

federal regulations in effect at the time of trial. The federal regulations did not exist at the time the 1957 Thunderbird was manufactured and were not introduced into evidence.

▮ Plaintiff predicates his theory of recovery on the principle of strict liability in tort for the defective design and condition of the 1957 Thunderbird armrest as applied in the so-called "second collision" or "injury enhancement" doctrine. *See generally:* Annot. 42 A.L.R.3d 560 (1972). While the second collision doctrine is a new concept to Missouri state law, there is ample precedent for its application found elsewhere.[1] And for the reasons which follow, we believe that its application should receive our cachet of acceptance here.

In *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo.1969), the rule of strict liability in tort embodied by Restatement (Second) of Torts § 402A (1965) was adopted by the Missouri Supreme Court [2] and is the matrix shaping the second collision doctrine. The second collision doctrine merely extends the scope of liability of a manufacturer to the situations in which the construction or design of its product has caused separate or enhanced injuries in the course of an initial accident brought about by an independent cause. *Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir. banc 1976); *Dreisonstak v. Volkswagenwerk, A.G.,* 489 F.2d 1066 (4th Cir. 1974). In this case, the second collision was plaintiff's body striking the armrest after the first collision between the Thunderbird and the Uttendorfer vehicle. The second collision doctrine differs from the typical § 402A case, in that the defect would not have produced any injury in the absence of an intervening cause which sets the injury producing cycle into action. The source of the original or intervening cause is irrelevant so long as the plaintiff's particular use of the product is reasonably foreseeable. *Nanda v. Ford Motor Co.,* 509 F.2d 213 (7th Cir. 1974). The Eighth Circuit, in applying Missouri law and in adopting the second collision doctrine, specifically held that a manufacturer could be held liable for injuries shown to have been caused or enhanced by the defective condition of its product which was being used in a manner reasonably anticipated in the course of an accident brought about by an independent cause. *Polk v. Ford Motor Co.,* supra.

The policy considerations supporting the application of § 402A strict liability to the second collision doctrine are congruent and compelling. The doctrine is based on the public policy that the costs of injuries from defective products are to be borne as a cost of business by the manufacturer who placed the product in the stream of commerce and not by the injured parties who are unable to protect themselves. *Keener v. Dayton Electric Manufacturing Co.,* supra; *Polk v. Ford Motor Co.,* supra; Restatement (Second) of Torts § 402A, comment (c) (1965).

"[T]he rule of strict liability is an economic theory applicable to persons engaged in the business of selling products for use or consumption, where the concepts of care, wrong, fault, and negligence in general, are no longer the deter-

---

1. *Huff v. White Motor Corp.,* 565 F.2d 104 (7th Cir. 1977), and *Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir. banc 1976), each contains a thorough treatment of the law regarding application of the second collision doctrine, including a listing of the jurisdictions accepting or rejecting the doctrine's application. With the *Huff* decision, 31 jurisdictions had accepted the concept, and only two had spurned it.

2. § 402A as adopted in *Keener,* provides:

"(1) One who sells any product in a defective condition reasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

minants of liability; and a case has been said to be one of strict liability in tort, when neither care nor negligence, neither good nor bad faith, and neither knowledge nor ignorance will save a defendant." 72 C.J.S. Supplement Products Liability § 7.

The seminal case in the second collision area is *Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir. 1968). The court recognized that while a manufacturer's duty could rest upon general negligence principles, each state should feel free to supplement the common law with a doctrine of strict liability in tort as a matter of social policy. *Id.* at 502, n.5. Missouri has adopted the strict liability formulation. *Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo. banc 1977); *Keener v. Dayton Electric Manufacturing Co.,* supra. Although application of either approach will frequently produce the same result—and there is a logical melding of the two—there are important distinctions between the two concepts. The strict liability plaintiff need not prove that the manufacturer has violated the standard of reasonable care with respect to the adoption of a particular product design; he need only prove that the design was so defective as to make the product unreasonably dangerous for its anticipated use. Negligence, knowledge or fault of a manufacturer are irrelevant where recovery is sought under strict liability. *Smith v. Old Warson Development Co.,* 479 S.W.2d 795 (Mo. banc 1972). In a strict liability case, the focus is upon the dangerous condition of a product designed in a particular way. In a negligence case, the concern is with the reasonableness of the manufacturer's actions in designing the article. As such, a product may be dangerous to a degree which the law of strict liability will not tolerate, even though the actions of the designer were entirely reasonable in light of what was known at the time the product was planned and sold.

To recover under the second collision doctrine, the plaintiff has the burden of proving that the product was defective in condition or design when it left the hands of the manufacturer. *Huff v. White Motor Corp.,* 565 F.2d 104 (7th Cir. 1977); Restatement (Second) of Torts § 402A, comment (g) (1965). To establish that the product was defective, plaintiff must show that he was injured while using the product in its intended manner. *Keener v. Dayton Electric Manufacturing Co.,* supra. Further, the plaintiff has the burden of proving that the product was unreasonably dangerous; i. e., the product must be dangerous to an extent beyond that which would be contemplated by the user with ordinary knowledge common to the community as to its characteristics. Restatement (Second) of Torts § 402A, comment (i) (1965). If there is evidence from which a jury could find that an unreasonably dangerous condition existed and that the defect caused the injury, the evidence is sufficient to support a jury verdict against the manufacturer. *Nanda v. Ford Motor Co.,* supra.

In this case, plaintiff produced evidence from his expert witness that the 1957 Thunderbird armrest was defective, in that it was constructed of hard plastic with minimal energy-absorbing capacity; that it was lightly padded; and that its pointed shape was such as to concentrate the force of energy absorbed by the body. In light of this evidence the jury could have reasonably found that the armrest was defective and that it was unreasonably dangerous for its anticipated use.

Ford's other arguments that a collision with another vehicle was not an anticipated use, that the armrest was not defectively designed in light of the state of the art of armrest design when the 1957 model was produced, and that the armrest meets present day federal standards under the regulations promulgated under 15 U.S.C. § 1392 (1970), are not persuasive to the outcome of this case. It has been held that even misuse of a product may be reasonably foreseeable. *Rogers v. Toro Mfg. Co.,* 522 S.W.2d 632 (Mo.App.1975); *Higgins v. Paul Hardeman, Inc.,* 457 S.W.2d 943 (Mo.App. 1970). Further, it has been specifically held that a collision is a foreseeable incident of normal use of a motor vehicle. *Huff v.*

*White Motor Corp.,* supra; *Polk v. Ford Motor Co.,* supra; *Larsen v. General Motors Corp.,* supra. Ford argues that it built the safest armrest possible under the technology existing in 1957. Such a contention has no bearing on the outcome of a strict liability claim, where the sole subject of inquiry is the defective condition of the product and not the manufacturer's knowledge, negligence or fault. Even if the argument was relevant, it is not supported by the evidence. Plaintiff's expert witness stated that the principles of energy absorption, including the use of padded materials and the elimination of sharp objects, have been known for 300 years. These principles could have been applied in the 1957 design, even though it may not have been a federal regulation violation to fail to do so. Finally, the present day federal standards for armrest design were not introduced into evidence and are not before us. Moreover, compliance with the minimum federal standards does not mitigate a manufacturer's responsibility under the theory of strict liability any more than does compliance with the state of the art unless such standards require the defective condition to exist.

■ Ford never concedes that the armrest was defective and also contends that it should not be held responsible for the injury caused by an article manufactured as long ago as 1957. A reasonable response to this contention is found in *Mickle v. Blackmon,* 252 S.C. 202, 166 S.E.2d 173 (1969), where, in a 1962 collision, the plaintiff was impaled on a 1949 Ford gearshift lever, leaving her a paraplegic. In rejecting the mere passage of time as an immunity factor, the South Carolina Supreme Court stated, l.c. 186:

We readily concede that the passage of thirteen years between the marketing of a product and its injury-producing failure is a formidable obstacle to fastening liability upon the manufacturer. However, it may reasonably be inferred in this case that the advanced age of the ball was coincidental with its failure rather than the cause of it, and that the knob would have shattered upon a comparable impact had it occurred much earlier in the life of the car. The important inquiry is not how long the knob lasted but what caused its failure. Mere passage of time should not excuse Ford if its negligence was the cause. Since this conclusion finds support in the evidence, the issue was for the jury.

So, here too, do we believe that the time factor is not relevant to Ford's contention of immunity, for, as mentioned, there was evidence from which the jury could find that the design was unreasonably dangerous.

■ Ford argues that the trial court erred in submitting plaintiff's products liability verdict directing instruction as it deviated substantially from M.A.I. 25.04.[3] Modification is proper where the M.A.I. does not squarely fit the plaintiff's theory of the case. *Erny v. Revlon,* 459 S.W.2d 261 (Mo.1970). M.A.I. 25.04 was not tailored precisely for use in a second collision case. Hence, some modification was necessary here, and we find no prejudical error as a result.

■ Paragraph first of the challenged instruction increases the plaintiff's burden of proof by requiring the jury to

3. Plaintiffs' verdict director read:

"Your verdict must be for plaintiff and against defendant Ford Motor Company if you believe:

First, that the defendant Ford Motor Company could reasonably have foreseen that the Thunderbird could be involved in a collision and the occupants injured by an armrest that was defectively designed, and

Second, that the armrests in the Thunderbird, as manufactured, were defectively designed and therefore dangerous when put to a use reasonably anticipated, and

Third, when plaintiff, David A. Cryts, used the Thunderbird the armrests were in substantially the same condition as when the Thunderbird was manufactured by defendant Ford Motor Company, and

Fourth, that plaintiff, David A. Cryts, used the Thunderbird in a manner reasonably anticipated and the defectively designed armrest directly caused or contributed to cause damage to plaintiff, David A. Cryts. (M.A.I. 25.04 modified by V.A.M.R. 70.01(e))"

find that Ford could have foreseen both the collision and the likelihood of injury proceeding from a defectively designed armrest. This added burden is consistent with the Eighth Circuit's interpretation of Missouri law in *Polk v. Ford Motor Co.,* supra, 1.c. 269:

> In a second collision case under Missouri law, the element of a foreseeability (reasonable anticipation) of misuse, becomes more significant. The manufacturer is entitled to have a jury consider whether or not the factors which precipitated the accident and injuries were of such nature that the manufacturer should reasonably have anticipated, at least in general terms, such use of the automobile under such circumstances. While a Missouri court has held that a manufacturer may be held in strict liability for the *foreseeable* consequence of misuse, we find *no support for the proposition that any* collision is foreseeable or that *any* misuse will automatically be covered without reference to its foreseeability.

In any event, plaintiff's addition to his own evidentiary burden was not prejudicial to the defendant. *Joly v. Wippler,* 449 S.W.2d 565 (Mo.1970); *Walkley v. Sears Roebuck and Co.,* 536 S.W.2d 169 (Mo.App.1976); *Griggs v. Riley,* 489 S.W.2d 469 (Mo.App. 1972). While this court hesitates to approve any deviation from an M.A.I. instruction, the true test for proper submission is whether the instruction is substantially correct. *Burrell v. Mayfair-Lennox Hotels, Inc.,* 442 S.W.2d 47 (Mo.1969); *Jackson v. Cherokee Drug Co.,* 434 S.W.2d 257 (Mo. App.1968).

■ A similar analysis requires our dismissal of Ford's other complaints. The fact that paragraph two focuses upon the defective design of the armrests as manufactured, rather than the defective nature of the automobile as a whole, does not prejudice the defendant. (*Compare: Williams v. Ford Motor Company,* 411 S.W.2d 443 (Mo. App.1966), where the defective article was described as a "steering gear" rather than a "Thunderbird.") The use of the phrase "defectively designed" rather than "defective" is also cited as error by defendant, but any difference in meaning is insignificant. "Defective" includes the notion of excessive preventable danger. *Self v. General Motors Corp.,* 42 Cal.App.3d 1, 116 Cal.Rptr. 575 (1974). In *Higgins v. Paul Hardeman, Inc.,* 457 S.W.2d 943 (Mo.App.1970), another products liability case, this court refused to rule that as a matter of law, a "defective condition" did not exist where a hydraulic system did not "disintegrate, break down, crack, or fail." Rather, this court recognized that a dump truck hoist designed to drop the truck bed when only slight pressure was applied to an exposed control rod created a dangerous condition. " . . . [T]he 'dangerous condition' is the failure of the design to include a safety factor." *Id.* at 947.

■ Ford also argues that plaintiff should have concluded the verdict directing instruction with M.A.I. 19.01, the verdict director for joint tortfeasors. As this specific contention of error was not raised either at the time of trial, or in Ford's motion for a new trial, it will not be considered on appeal. Rule 78.07; *Chambers v. Kansas City,* 446 S.W.2d 833 (Mo.1969); *Hughes v. Dwyer,* 546 S.W.2d 733 (Mo.App.1977); *Robinson v. St. John's Medical Center,* 508 S.W.2d 7 (Mo.App.1974).

■ Defendant Uttendorfer alleges further error in the instructions, particularly the first paragraph of plaintiff's Instruction No. 2:

> Your verdict must be for plaintiff and against defendant Robert J. Uttendorfer if you believe:
>
> First, defendant Robert J. Uttendorfer either: failed to keep a careful lookout, or *drove on the wrong side of the road,*
>
> . . . (emphasis added)

Uttendorfer submits that the emphasized portion of the instruction constituted a misdirection to the jury, amounted to a misstatement of the law and gave the jury a roving commission to return a verdict in favor of the plaintiff. We find these arguments without merit.

From the evidence presented by the plaintiff, a jury could fairly infer that Ut-

tendorfer, ostensibly turning left, did drive on the wrong side of the road. In *Moore v. Eden,* 405 S.W.2d 910 (Mo.1966), it was held that a similar instruction was proper where the plaintiff's allegation was that the defendant motorist had made a negligent left turn. There was testimony to the effect that the defendant had driven in the wrong lane as much as forty feet before the collision. In the instant situation, Uttendorfer was alleged to have traveled in the wrong lane at least that far. Consequently, the jury was not granted a "roving commission" to find Uttendorfer guilty if he crossed into plaintiff's lane. Of course, a driver must necessarily cross into the line of oncoming traffic to make a left turn. Such a maneuver, if properly executed, does not constitute driving on the wrong side of the road. *Ellison v. Simmons,* 447 S.W.2d 66 (Mo.1969). But before the jury could find for the plaintiff on Instruction No. 2, they had to determine also that defendant was negligent by driving on the wrong side of the road in a manner different from the usual left turn, and that as a direct result of such negligence plaintiff was injured. Such a finding could be reasonably inferred from plaintiff's evidence. Thus, the instruction was proper.

Finally, Uttendorfer urges that the trial court erred in refusing to permit the jury to view a film of the location of the accident offered to demonstrate whether Uttendorfer could have lost sight of plaintiff's car prior to the collision. The film, admittedly nubilous, was taken by a photographer traveling in a morthbound vehicle along the access road adjacent to Interstate 55. After a viewing in camera, plaintiff objected to the admissibility of the motion picture and was sustained. The same principles which govern the admission of still photographs apply to the admission of motion pictures. *Morris v. E. I. Dupont De Nemours & Co.,* 346 Mo. 126, 139 S.W.2d 984 (1940).

. . . Perhaps a greater degree of caution is required in admitting the motion picture because, while the danger of false perspective or of intentional fabrication exists as to both, these dangers are greater in the motion picture. Considerable discretion must be vested in the trial court as to the accuracy of the picture. * * * Considerable discretion must also be left in the trial court as to the relevancy of the picture and as to whether it will tend to aid or confuse the jury. *Id.* at 987.

Photographic evidence must be practical, instructive, and calculated to assist the jury and the court in understanding the case. *Gignoux v. St. Louis Public Service Co.,* 180 S.W.2d 784 (Mo.App.1944). The ruling of the trial judge on the question of admissibility must be accorded great weight and will not be disturbed on appeal unless shown to be in abuse of discretion. *State v. Eilers,* 406 S.W.2d 567 (Mo.1966); *Fox v. City of Kansas City,* 343 S.W.2d 200 (Mo. App.1960). We have viewed the film. As the threshold question to admissibility is whether or not the offered evidence will aid the jury, we cannot say that the trial court abused its discretion by rejecting the motion pictures of admittedly poor quality.

Judgment affirmed.

SMITH and KELLY, JJ., concur.