**Mary GRANT, as Trustee for the Heirs of Gregory Grant, Deceased, Appellee,**

v.

**The CITY OF DULUTH, a municipal corporation, and Jeff Vollman, Appellant.**

**No. 81–1117.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1981.

Decided March 11, 1982.

---

Harry L. Munger of MacDonald, Munger & Down, Duluth, Minn., for appellee.

Edward T. Fride, Charles B. Bateman of Hanft, Fride, O'Brien & Harries, P.A., Duluth, Minn., for appellant.

Before BRIGHT and ROSS, Circuit Judges, and GIBSON, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

This is a diversity action under the Minnesota wrongful death statute seeking dam-

ages for the death of Gregory Grant, a 22-year-old married male. Grant, a participant in an impromptu graduation party held on the grounds adjacent to the defendant's closed and locked amusement park, was fatally injured when he, together with a companion, trespassed onto the closed amusement park, climbed the outside structure of a 30-foot slide, and came in contact with a chain midway down the slide. The jury assessed total damages of $349,330 for the wrongful death. The jury found that thirty percent of the negligence which caused the fatal accident should be attributed to the decedent and seventy percent should be attributed to the defendant. Thus, decedent's trustee, his widow, was awarded $224,531. The defendant appeals the denial of his alternative motions for a new trial and judgment notwithstanding the verdict. Because we conclude that the district court misstated to the jury the relevant Minnesota law governing both the duty of a possessor of land to a trespasser and the duty even of a trespasser to act reasonably, we reverse and remand for a new trial.

The accident which gave rise to this case occurred on June 3, 1977. There was no dispute over the fact that the accident on the slide was the physical cause of decedent Grant's death.

## I.

In early 1977 the defendant leased from the City of Duluth a 40,000-square-foot area near the city zoo and erected thereon various amusement rides, including the slide in question. There was some dispute as to whether the defendant, Jeff Vollman (hereafter defendant or Vollman), had had the whole area fenced by the time the accident occurred. However, it was established that there was at least a fence around the slide. The defendant testified at trial that he had placed a solid chain link fence, which was approximately seven feet high with three strands of barbed wire at the top, around the perimeter of the area. He said the gates of this fence were locked and that some ten no-trespassing signs were placed on the property.

The slide itself was a thirty-foot structure utilized mainly by small children who would slide down from the thirty-foot height to the ground level. Defendant testified that, to discourage unauthorized use, two chains were placed on the slide after the park closed at night, one at the top and the other at the middle. A white bag was hung from one of the chains to enhance the visibility of the chain. According to the defendant, there was a sign in front of the slide stating, "Danger—this slide is chained and locked nightly for your protection." There were lights in the amusement area, although there was some conflict in the testimony as to how well lighted the area actually was on the night of Grant's fatal accident. Defendant Vollman testified that he told one group of young people, which included the decedent, that they should stay out of the amusement area and not go down the slide because it was chained and locked.

The decedent's companion in the incident testified that on the night in question he was in the decedent's van with the decedent and two girls and that the decedent was "drinking quarts of Pabst." The companion inquired whether anyone wanted to go down the slide and the decedent said that he would. The companion testified that he and the decedent climbed over a six-foot-ten-inch fence to get to the slide and that he observed no-trespassing signs but decided to ignore them. The companion and decedent had a race to climb up the scaffold of the thirty-foot-high slide despite the presence of stairs leading to the top. Decedent went down first. He thereby suffered injuries which proved, three days later, to be fatal.

It appears from this evidence that defendant took about all the measures he was able to take to restrain trespassers from unauthorized entry on and use of the amusement park. He was undoubtedly vexed by the problems and difficulties engendered by these trespassers.

On these facts, in our opinion, there is a question as to whether the plaintiff even

made out a submissible case. The defendant, as we have already noted, went to great lengths to keep people out of the amusement park while it was closed. He attempted, by means of a fence, chains, locks, and signs, to warn any potential trespassers that they should not enter the park after hours. The decedent intentionally ignored the warnings. The only question which possibly should have gone to the jury was whether the steps taken by defendant to warn trespassers of the dangers of entering the unattended park were reasonably sufficient to apprise them of those dangers —if, that is, the trespassers were not already aware or should not have been expected to be aware of the dangers from the facts known to them.

## II.

Vollman suggests on appeal that seven errors requiring reversal were committed in the district court. Since we find that, on the basis of one of those alleged errors, a new trial is required, we will not decide the merits of all of the defendant's claims. The main issue, involving liability, centers on the duty of care as it applies respectively to the possessor of the land and the trespasser on that land. Was the jury properly instructed and informed of the applicable standards?

## III.

The Minnesota Jury Instruction Guide Rules regarding "Duty of Possessor to Trespasser—Injury Caused by Condition of the Premises," provide:

> A possessor of land is under no duty to a trespasser to maintain his premises in a reasonably safe condition.
>
> If, however, a possessor of land knows or from facts know to him has reason to know that trespassers regularly use certain portions of his premises and if he creates or maintains an artificial condition on his premises which he knows is likely to cause death or serious bodily harm, and which is such that he has reason to believe that trespassers would not discover it, then he has a duty to use

reasonable care to warn a trespasser of the danger or risk involved, unless the trespasser is already aware, or from facts know to him should have been aware, of the condition of the premises and the risk involved.

■ There was evidence presented at trial that Vollman was aware both that young people were trespassing onto the amusement park at night and that they had previously trespassed upon the slide. The jury could have reasonably found, from the description of the chain across the slide, that Vollman created or maintained an artificial condition on his premises which he knew was likely to cause death or serious bodily harm. The jury also could have concluded that Vollman had reason to believe that trespassers would not discover the dangerous artificial condition. The proper question for the jury then to ask in regard to the duty owed by Vollman to Grant was whether Vollman used "reasonable care to warn" of the danger or risk involved. Even if Vollman knew that trespassers regularly entered the amusement park and used the slide, he did not have a duty to maintain the premises in a reasonably safe condition.

■ We believe that the jury may have been misled about the applicable standard to be applied to Vollman's duty of care to the decedent. For instance, just after the jury was sworn, the court said during its opening remarks:

> I believe that under the law if you reasonably anticipate that people might be going in and out of your property, you have a duty to use reasonable care for their safety. I think that's what the law is as we talked it over here. And so what you have, you can't set a trap for anybody even though they are trespassing. You know, you can't set up an unreasonably dangerous condition. Someplace in there the duty to use reasonable care or the duty not to set a trap is what this case is about as I understand it.

And later, after the jury viewed the site of the accident, the court said to it:

And yet, despite all that, if the signs were there and the fences were there, if it was the habit of kids to go over that fence and go in there and monkey around, and if this gentleman (indicating) knew that, then he had a duty to take reasonable care to see that the premises were safe for them for the purposes for which they were using it.

What I am saying specifically is that, if he knew the kids were going in there, he had a duty to have the premises in a reasonably safe condition; that is, that the chains or whatever barriers he put up should be such as to make it so it didn't present an unreasonable danger to those trespassers.

And it seems like anomaly, it seems unusual, but it is not for you to say that a trespasser can be exposed to an unreasonable danger.

You might feel that perhaps they should not have trespassed. That's not the question.

The question is:

Was there an unreasonable danger presented by the arrangement of these chains? And that's going to be, I believe, the focal point of your argument.

The question of whether the warning— well, maybe the fence wasn't there. That might make some difference in how you'd feel about how much precaution a person should take on the inside.

But the fact of the existence of the fence and the sign and the warnings does not preclude recovery for the plaintiff in this action if you find that the chain was set up in such a way as to present an unforseeable and an unreasonably dangerous situation—and, of course, there is the question of whether or not this decedent used due care for his own safety. "Did he take reasonable precautions?"

Vollman's attorney duly objected to the court's characterization of Vollman's duty to the plaintiff. At various points during the trial the court did try to correct its previously mistaken instructions. However, it is this court's belief that in all likelihood an improper or, at the least, a confused standard of care was left in the minds of the jury. The correct standard of care to be applied to the defendant was not unambiguously and conclusively provided to the jury in order for it to be properly guided in its decisions.

■ Furthermore, Minnesota applies principles of comparative fault in negligence actions. Minn.Stat. § 604.01, subd. 1 (1978). Recovery is permitted only from persons whose negligence is greater than that of the person seeking recovery. Damages must "be diminished in proportion to the amount of fault attributable to the person recovering." *Id. See, e.g., Maday v. Yellow Taxi Co. of Minneapolis,* Minn., 311 N.W.2d 849, 850 and n.2 (1981).

Therefore, it was necessary for the jury to determine the plaintiff-decedent Grant's degree of negligence also. In order to do so properly, the jury had to be supplied with the correct standard of care by which Grant's behavior on the night in question was to be judged. We believe that the court's instructions were misleading in this regard.

The court, during the questioning of a witness, said in the presence of the jury:

All right, here's the situation. The risk that they [the decedent and his friend] took climbing [the slide], if they took it, does not enter into the risk that they took sliding down.

Now you can talk about risk. And maybe the fact that he took a risk climbing the wall might show his propensity to risk sliding under a chain, and that's what you're getting at.

And you go ahead and ask the question. But remember that the risk was the risk that they took as they stood at the top, having accomplished the climb, and what risk could they foresee, and what liability did they assume at that time for injury.

And later, again in the presence of the jury:

When he stood on the top of the slide and decided to go down, should he as a reasonable person—you have to put a reasonable person there, not drunk, a reasonable person in charge of his [faculties]—

should he have known that, as he took off there, he was faced with a danger? You know, what was in his mind or should have been in his mind at that time?

. . . .

The whole thing focuses on what he saw and thought and knew or should have known as he took off down that slide.

. . . .

Was there an open and obvious danger there that he undertook and risked?

And so it all kind of focuses on the decision that he made at the top of the slide.

■ The court instructed the jury that the only act of consequence in evaluating the decedent's conduct was his decision to go down the slide once he was atop it. The court, in several instances, indicated its reasoning as follows: (1) Only those actions which proximately caused Grant's injury should be scrutinized. (2) Proximate cause is synonymous with direct cause. (3) The only direct cause of Grant's injury was his descent on the slide. (4) The only action of Grant's to be evaluated was the descent on the slide.

The court said to the defense attorney at trial:

> The rest of it is—if you were defending this case, you would be the first to argue that there is no direct relationship with climbing the fence, it's not the proximate cause of the injury, climbing the wall is not the proximate cause of the injury, the proximate cause of the injury is with reckless abandon sliding down the hill.

And in its memorandum opinion the court wrote:

> The Court concluded that neither climbing over the fence (if it was erected) nor climbing the steel supports was the direct cause of the injury to plaintiff-decedent, but rather that the act of negligence, if any, on the part of the plaintiff-decedent consisted of his decision to make the slide down the hill in the darkness or semi-darkness.

*Grant v. Vollman*, 526 F.Supp. 15 (D.Minn. 1981) (mem.). We believe that this view expresses too narrow a conception of proximate cause.

The most recent definition given by the Supreme Court of Minnesota declares that "[p]roximate cause exists if the negligent conduct was a substantial factor in bringing about the injury. *Johnson v. Evanski*, 221 Minn. 323, 328, 22 N.W.2d 213, 216 (1946); *Medved v. Doolittle*, 220 Minn. 352, 356, 19 N.W.2d 788, 790 (1945)." *Flom v. Flom*, Minn., 291 N.W.2d 914, 917 (1980). No less an authority than Prosser has stated that proximate cause exists when there is a reasonably close causal connection between the conduct and the resulting injury. W. L. Prosser, The Law of Torts 143 (4th ed. 1971). In our view, it would not be unreasonable to conclude that the acts comprising the sequence of events which commenced when Grant and his friends entered the closed amusement park were substantial factors in bringing about his injury. We believe the jury should have been allowed to consider these acts in assessing Grant's behavior. Certainly no prudent person would conduct himself as did Grant. Facially and on deliberate consideration, it appears that Grant's negligent and reckless conduct far exceeds the claimed negligence of defendant Vollman.

Causation is, of course, an issue of fact to be determined by the jury. Such a determination is not to be upset without a finding that it is manifestly contrary to the weight of the evidence. *E.g., Flom v. Flom, supra* at 917. However, in the case before us we believe that the members of the jury may have been misled or confused into believing that they were to judge Grant's behavior only from the time he was at the top of the slide. Thus the issue of causation in regard to the sequence of events leading up to that time would not have been resolved by the jury below, and we are not here, in effect, overturning a jury finding at all.

IV.

■ We also want to discuss one of the other issues raised on appeal, as this issue will undoubtedly arise on retrial. Vollman urges that it was error for the trial court to refuse to give a jury instruction to the

effect that any jury award would not be subject to income taxes.[1] He claims that, in the same vein, it was error to refuse to permit his counsel to ask an economist, called as a witness by the plaintiff, about the impact of income taxes on any past or future earnings.

We recognize that this question is governed by state law in a diversity case such as this. We are also aware that the Minnesota Supreme Court, in the last case in which it discussed the issue, declined to change the existing law in Minnesota on the question. *Anunti v. Payette*, Minn., 268 N.W.2d 52, 55 (1978). That law, as it stood under *Briggs v. Chicago G.W. Railway Co.*, 248 Minn. 418, 80 N.W.2d 625 (1957), held that it was not error to deny a request that the jury be instructed that a recovery will be exempt from federal income taxes. However, the Minnesota Supreme Court's last pronouncement on the issue came before the United States Supreme Court decision in *Norfolk and Western R. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

In *Norfolk*, a case arising under the Federal Employers' Liability Act, the court held that it was error to refuse to give an instruction such as the instruction at issue here. There the Court wrote:

> [W]e agree with petitioner that, as Judge Ely wrote for the Ninth Circuit,
>
> > "[t]o put the matter simply, giving the instruction can do no harm, and it can certainly help by preventing the jury from inflating the award and thus over-compensating the plaintiff on the basis of an erroneous assumption that the judgment will be taxable." *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 297 (1975).
>
> We hold that it was error to refuse the requested instruction in this case. That instruction was brief and could be easily understood. It would not complicate the trial by making additional qualifying or supplemental instructions necessary. It would not be prejudicial to either party, but would merely eliminate an area of doubt or speculation that might have an improper impact on the computation of the amount of damages.

444 U.S. at 498, 100 S.Ct. at 759.

Frankly, we favor the policy considerations behind the Supreme Court's decision in *Norfolk*. They may even be compelled by the requirements of due process of law, though we decline to so rule at this time. The district court should give the requested instruction for cases in federal court in the absence of a state decision to the contrary issued after *Norfolk*.

For the foregoing reasons, we reverse and remand for a new trial.

---

1. The court refused defendant's Supplemental Request for Instructions, Instruction No. 16:

   In the event that you determine under my instructions to award the plaintiff a sum of money, you are instructed that the award is not subject to any deduction for federal or state income taxes.