Roberta Rae ADAMS, Appellee,

v.

FUQUA INDUSTRIES, INC., Appellant.

Roberta Rae ADAMS, Appellant,

v.

FUQUA INDUSTRIES, INC., Appellee.

Nos. 85–2382, 85–2383.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1986.

Decided June 4, 1987.

Rehearing and Rehearing En Banc Denied July 15, 1987.

Peter von Gontard, St. Louis, Mo. (Ronald E. Fox, Ian P. Cooper, Shepherd, Sandberg & Phoenix, Frank N. Gundlach, Thomas B. Weaver, Wilbur L. Tomlinson, Armstrong, Teasdale, Kramer & Vaughn, of counsel), for appellant.

Paul C. Hetterman, St. Louis, Mo., for appellee.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.[*]

MAGILL, Circuit Judge.

Fuqua Industries, Inc., ("Fuqua") appeals from the district court's entry of judgment upon a jury verdict of $1,575,000 in favor of Roberta Rae Adams ("Adams") for injuries she sustained while riding a Fuqua lawnmower. Fuqua contends on appeal that the district court erred in excluding Fuqua's rebuttal evidence. We conclude that the district court's exclusion materially prejudiced Fuqua's ability to present a defense, and we reverse and remand for a new trial.

## I. BACKGROUND.

In 1971 Adams bought a Snapper 307X rear engine riding lawnmower,[1] which she used for ten years without incident. In June of 1981, she accidentally ran over a telephone line with the mower, and sent it to a local machinery repair shop for inspection and repairs. Subsequently, Adams found the shift lever to be stiff and difficult to put into gear. While using the mower on July 11, 1981, she was unable to engage reverse. She leaned down to see what was wrong, and her left foot slipped off the clutch/brake pedal, which caused the mower to jerk forward and hit a telephone pole, throwing her off. While she was trying to get clear of the still-running mower, her foot was caught in the blades. As a result of her injuries, her lower right leg had to be amputated.

Adams filed a diversity suit in the District Court for the Eastern District of Missouri. Her complaint first sought damages under negligence and strict liability in tort and was later amended to strike the negli-

---

* The HONORABLE THOMAS E. FAIRCHILD, United States Senior Circuit Judge for the Seventh Circuit, sitting by designation.

1. The mower had been manufactured in 1971 by McDonough Power Equipment Company, which was later bought by Fuqua.

gence claim. Separate trials were held to determine liability and actual damages, for which the jury awarded Adams $1,750,000,[2] and to determine punitive damages, for which the jury found for Fuqua.

## II. STANDARD OF REVIEW AND APPLICABLE LAW.

■ Our review of the district court's evidentiary decisions is governed by the standard set out in *Warner v. Transamerica Insurance Co.*, 739 F.2d 1347, 1350 (8th Cir.1984). We may only reverse a trial court's determination of the admissibility of evidence where there has been a clear abuse of discretion. Where the district court excludes evidence of a critical nature, so that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted, the trial court has abused its discretion. *See Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir.1981), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981).

In this federal diversity action, Missouri law determines the substantive issues of liability. *McGowne v. Challenge-Cook Bros.*, 672 F.2d 652, 660 (8th Cir.1982). The Supreme Court of Missouri has adopted in full the doctrine of strict liability for defective products set forth in the Restatement (Second) of Torts, § 402A (1965). *Polk v. Ford Motor Co.*, 529 F.2d 259, 265 (8th Cir.1976), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976), *citing Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969).

■ Although Missouri law governs the substantive issues of liability, the Federal Rules of Evidence provide the standards of relevancy of evidence. *See Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Sturm v. Clark Equipment Co.*, 547 F.Supp. 144, 145 (W.D.Mo. 1982), *aff'd mem.*, 732 F.2d 161 (8th Cir. 1984). Where a state and federal evidentiary rule conflict, the proponent is entitled "to the benefit of the more favorable rule." *Bailey v. Kawasaki-Kisen, K.K.*, 455 F.2d 392, 397 (5th Cir.1972), *citing Roth v. Swanson*, 145 F.2d 262, 269 (8th Cir.1944).

## III. DISCUSSION.

### A. Exclusion of Fuqua's Rebuttal Evidence.

Fuqua argues on appeal[3] that the district court erred in excluding Fuqua's evidence regarding the feasibility of alternative designs when the mower was made, because Adams had "opened the door" to the feasibility issue. Adams argues that Fuqua's evidence was not rebuttal evidence but went to "state of the art," which is irrelevant to a strict products liability action under Missouri law. Adams also argues that it had not "opened the door" to Fuqua's evidence. As noted, we reverse and remand for a new trial solely because of this issue.

At trial, Adams elicited testimony from her expert witness that the accident had occurred because of the following: (1) the chain arms, which suspend the rear part of the mower deck from the frame of the mower, were defectively designed and had come unmoored, which made the gears bind; (2) the mower did not have a smooth-start clutch, so it would jerk forward when placed into gear, causing Adams to lose her balance when her foot slipped off the clutch pedal; (3) the mower did not have a deadman switch, which turns off the motor if the seat becomes unoccupied, so the mower continued to run after Adams fell to the ground; and (4) the mower had a rearward weight bias, which caused the front wheels to rise off the ground when they struck the telephone pole, and allowed Adams' leg to slide under the blades.

Throughout the trial Fuqua sought to show that neither a smooth-start clutch nor a deadman switch were commercially feasible to put on a lawnmower in 1971. Because of the evidentiary limitations placed

---

**2.** The amount of the award was reduced by ten percent, representing the percentage of fault attributable to Adams, to a total of $1,575,000.

**3.** No post-manufacture warning issue was raised in this case.

upon Fuqua, however, they could not present evidence on this point.

As a preliminary matter we must determine whether Fuqua has preserved this point for appellate review. Adams contends that Fuqua failed to make proper offers of proof and timely objections. In response, Fuqua first points to a motion in limine [4] brought by Adams, which was granted, precluding Fuqua from introducing "state of the art" evidence of lawnmower safety devices, including deadman switches, automatic blade stops or smooth-clutch mechanisms. Transcript (Tr.) at (2) 9–12.[5] We find that Fuqua clearly objected to the motion. Counsel for Fuqua argued: "I think by precluding the defendant from presenting evidence and cross-examining the witnesses of the plaintiff * * * with the question of the feasibility and possibility of the devices at the time of manufacture, precludes us from putting on a defense." Tr. (2) 11.

█ Although in this circuit a motion in limine does not preserve error for appellate review, the record reveals that Fuqua continued to object to the exclusion of feasibility evidence throughout the trial. *See* Tr. (2) 132–33, 192–93; Tr. (3) 120. We thus conclude that Fuqua preserved this issue for review.

We may now examine the merits of Fuqua's argument. Fuqua argues that it was severely prejudiced by its inability to present rebuttal evidence that alternative safety devices were not feasible when the mower was made. Fuqua argues that this prejudice was compounded when Adams suggested in closing argument that Fuqua could have placed these safety devices on the mower in 1971 but for an unexplained reason, did not.

Adams contends that Missouri law governing "state of the art" applies. The Missouri courts first discussed the applicability of "state of the art" to a strict liability case in *Cryts v. Ford Motor Co.*, 571 S.W.2d 683, 689 (Mo.App.1978). In finding Ford liable for a defectively designed auto armrest, the court dismissed Ford's contention that it built the safest armrest possible in 1957 as follows: "Such a contention has no bearing on the outcome of a strict liability claim, where the sole subject of inquiry is the defective condition of the product and not the manufacturer's knowledge, negligence or fault." This rule was most recently followed in *Johnson v. Hannibal Mower Corp.*, 679 S.W.2d 884, 885 (Mo. App.1984), which stated that "[s]tate of the art evidence is irrelevant in strict liability cases * * *. *Cryts* rejected as having no bearing in a strict liability claim the manufacturer's contention that it had built the safest product possible under the existing technology."

█ As we interpret the relevant Missouri law, a jury has wide latitude in finding that a product is unreasonably dangerous because it could have been constructed so as to reduce risk of injury. *Cryts*, 571 S.W.2d at 688; *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 378 (Mo. banc 1986). Adams need not prove that the absent devices were or should have been known to Fuqua in 1971 when the mower was manufactured. *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 438 (Mo. banc 1984). That the mower was as safe as other mowers manufactured at the same time is irrelevant to the question whether the mower was unreasonably dangerous. *Johnson v. Hannibal Mower Corp.*, 679 S.W.2d 884, 885 (Mo.App.1984). As explained in *Cryts*, 571 S.W.2d at 688:

4. The effect of the ruling on Adams' motion was to preclude Fuqua:

during any portion of the trial * * * from in any way mentioning * * * or attempting to introduce evidence of the following:
1. State of the Art regarding the design and manufacture of lawnmowers, including but not limited to * * *:
a) Any system which would operate in any manner to shut off the blade when the operator was out of the operating position;

b) The clutch mechanism;

* * * * * *

2. Any ASA or ANSI standards or government or industry standards in any way relating to lawmowers, and including, but not limited to, the Snapper Comet 307X or mowers similar to the one involved in the instant case.

5. The first number in the transcript page designation refers to the volume, *i.e.,* (2) 9 refers to page 9 volume 2.

In a strict liability case, the focus is upon the dangerous condition of a product designed in a particular way. In a negligence case, the concern is with the reasonableness of the manufacturer's actions in designing the article. As such, a product may be dangerous to a degree which the law of strict liability will not tolerate, even though the actions of the designer were entirely reasonable in light of what was known at the time the product was planned and sold.

Adams claims, relying on these cases, that Fuqua was correctly precluded from introducing feasibility evidence. The foregoing principles do not, however, in our opinion, control the solution of the problem before us.

In this case, Adams relied on the opinion of her expert that the danger could have been reduced by a deadman switch and a smooth-start clutch and also elicited testimony that such devices are technologically and commercially feasible to use on a mower and are "commonly used." This was permissible, because in showing that a mower can be made safer through the use of devices, a plaintiff must show that the devices exist and are not merely speculative. The testimony also impermissibly suggested, however, that such devices had

been available when the mower was built.[6] Adams then exploited the inference by arguing to the jury that Fuqua had not explained its failure to build these devices into the mower sold to Adams.[7] The presentation of this testimony, coupled with closing argument, suggested to the jury not only that such devices could have been on the mower sold to Adams in 1971, but also that Fuqua's conduct in omitting them from that mower was unreasonable. The insinuation that Fuqua had devices in 1971 which it unreasonably failed to put on Adams' mower was irrelevant to strict liability and was clearly prejudicial. Fuqua was precluded from rebutting it by introducing evidence that workable devices had not been developed by 1971.

■ We can find no Missouri case addressing the specific situation where a plaintiff's evidence and argument create the impression that safety features, commonly used at the time of trial, were also available when the product was built, but were for some unexplained reason withheld, while the defendant's rebuttal evidence that the devices had not been developed at the time of manufacture is disallowed. In our opinion, the Missouri courts would permit such rebuttal in like circumstances. This court has allowed rebuttal

---

6. Counsel for Adams asked Adams' expert the following:

Q. And when did that term [deadman control] first start to be used in the engineering field?
A. The term was first used, commonly, following its initial installation and use in New York City when the subway system was first put into service back in the mid-20's. Tr. (2) 113.

During a later bench conference, counsel for Fuqua argued:

Mr. Kelsey, in his direct examination, testified to deadman controls on subway trains in the 1920's * * *. Your Honor, I think that that opens the door for us to show what deadmen controls were available in the 20's and in between then and the date of manufacture of the mower. * * * [I]t seems his statements would appear to the jury to indicate that those deadman controls were possibly feasible at the time and could have been on this mower, and I don't think that's what the evidence is intended to show. Tr. (2) 132.

Although the court noted that Fuqua could, on cross-examination, point out differences be-

tween a deadman control on a lawnmower and on a subway train, we nonetheless feel that Fuqua was improperly restricted, especially in view of the inference created by Adams' closing argument. *See infra* note 7 and accompanying text.

7. Counsel for Adams argued:

If Mr. Jackson has got this automatic blade thing and its been refined and the corporation has refined it down to a second and a half, why did they try to do that? Do they refine it to a second and a half for a person who gets off, walks over and does something else, and comes back a few minutes later? No, that device is for the person who falls off so the blade doesn't cut their leg off and it stops in a second and a half or a second.

Please give that device to Roberta Adams to give her a shot at keeping her leg. "Why didn't you do it?" No explanation. Tr. (4) 90.

 * * * * * *

I won't belabor it, but you know that there were a number of things they could have done that they just didn't do and they haven't offered you any explanation. Tr. (4) 93.

evidence in cases similar to this one. In *Smith v. Firestone Tire & Rubber Co.,* 755 F.2d 129, 133 (8th Cir.1985), a products liability suit involving an allegedly defectively designed wheel rim, we ruled that the defendant could offer evidence of OSHA standards to rebut the plaintiff's argument that "single piece rim wheels were a safe design alternative to the multi-piece rim" that was allegedly defectively designed. *See also Murphy v. L. & J. Press Corp.,* 558 F.2d 407, 411 (8th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978) (both parties entitled to present evidence on feasibility where a central issue in the case).[8]

We thus conclude that the trial court erred in excluding Fuqua's rebuttal evidence regarding the feasibility of safety features when the lawnmower was made. We further find, in light of the standards for reversal set out in *Warner* and *Robbins, supra,* that excluding Fuqua's evidence prejudiced the jury's ability to reach a just decision and was thus an abuse of discretion. Accordingly, we reverse and remand for a new trial.

Although not essential to our decision, we now turn to the parties' other contentions, in order to avoid needless appeals in any upcoming proceedings.

**B. Cross-Examination of Adams' Expert Witness.**

 Fuqua argues that the district court erred in prohibiting cross-examination of Adams' expert about the fact that his own consulting firm used a riding mower without a deadman switch, after he had testified that the mower in question was unreasonably dangerous for, among other reasons, lack of a deadman switch. Fuqua claims that the purpose of cross-examination was to impeach the expert's credibility.

Adams responds that the trial court did not limit cross-examination and, alternatively, that there was no abuse of discretion. The record reveals that the trial court's reason for exclusion was based upon "state of the art." Tr. (2) 133–34. Because of our "state of the art" interpretation discussed *supra,* and because we find the issue was relevant to the expert's credibility as a witness, we hold that it was error to restrict the scope of cross-examination in this regard.

**C. Taxability Instruction.**

Fuqua next argues that the trial court erred in refusing their jury instruction that any damages awarded were not subject to income tax. Fuqua contends that giving such an instruction is a procedural matter and thus federal law is controlling. Adams argues that Fuqua failed to preserve the issue for review,[9] that the district court did not err in refusing the requested instruction, and alternatively that any error was harmless.

Fuqua primarily relies on *Norfolk and Western Railway Co. v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) in support of its argument.[10] *Norfolk,* a FELA case, held that it was error to refuse to instruct the jury that a wrongful death award was exempt from income tax. The rationale was that a jury could mistakenly inflate an award to compensate for taxes. Fuqua argues that this rationale transcends the FELA context and should be applied here. Fuqua claims that this circuit and other federal courts have applied *Norfolk* to diversity cases, and moreover, that Missouri courts favor a taxability instruction. Although we feel public policy supports Fuqua's argument, *see Dempsey v. Thompson,* 251 S.W.2d 42, 45 (Mo.1952),

---

**8.** Other circuits support our view. *See Foster v. Caterpillar Tractor Co.,* 714 F.2d 654, 657 (6th Cir.1983); *Walker v. Trico Mfg. Co.,* 487 F.2d 595, 600 (7th Cir.1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *Herndon v. Seven Bar Flying Service, Inc.,* 716 F.2d 1322, 1329 (10th Cir.1983), *cert. denied sub nom. Piper Aircraft Corp. v. Seven Bar Flying Service, Inc.,* 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984).

**9.** This argument is incorrect. The district court held on the merits that Fuqua was not entitled to the instruction.

**10.** This case is referred to in quoted sources both as *Liepelt* and *Norfolk.*

their interpretation of applicable law is incorrect. The Eighth Circuit squarely addressed this issue in *Grant v. City of Duluth,* 672 F.2d 677, 682–83 (8th Cir.1982). In a wrongful death diversity action, we stated:

> Vollman urges that it was error for the trial court to refuse to give a jury instruction to the effect that any jury award would not be subject to income taxes. [footnote omitted]. * * * We recognize that this question is governed by state law in a diversity case such as this. We are also aware that the Minnesota Supreme Court, in the last case in which it discussed the issue, declined to change the existing law in Minnesota on the question. * * * However, the Minnesota Supreme Court's last pronouncement on the issue came before the United States Supreme Court decision in [*Norfolk*].

In holding that it was error to refuse the requested instruction, we concluded as follows:

> Frankly, we favor the policy considerations behind the Supreme Court's decision in *Norfolk.* They may even be compelled by the requirements of due process of law, though we decline to so rule at this time. The district court should give the requested instruction for cases in federal court *in the absence of a state decision to the contrary issued after Norfolk.*

*Grant* at 683 (emphasis added).

■ Thus, our holding in *Grant* was based on the assumption that the Minnesota courts would follow *Norfolk.* We expressly recognized, however, that whether to give or withhold a taxability instruction is a question of state law, which we are bound to follow. *See also Bartak v. Bell-Galyardt & Wells, Inc.,* 629 F.2d 523, 531 (8th Cir.1980) ("The district court should consider [*Norfolk*] in determining this issue under *South Dakota law.*") (emphasis added). The majority of circuits have reached the same conclusion. The Sixth Circuit most recently examined this issue in *Losey v. North American Philips Consumer Electronics Corp.,* 792 F.2d 58, 61–62 (6th Cir.1986). The court stated:

> The district court refused Philips' request to instruct the jury that compensatory awards are not taxable income under the Internal Revenue Code. * * * Philips argues that the district court should have applied the rule announced in [*Liepelt*] * * *. We cannot, however, mandate the applicability of *Leipelt* [sic] in this case. * * * We conclude that the district court properly applied Tennessee law. When a tort action is brought in federal court pursuant to diversity jurisdiction, basing liability on state law, the court must apply state law in regard to availability and computation of damages. Accordingly, we find no reversible error in the district court's refusal to instruct the jury on the tax consequences of an award of compensatory damages.

*See also Estate of Spinosa,* 621 F.2d 1154, 1158–59 (1st Cir.1980); *Vasina v. Grumman Corp.,* 644 F.2d 112, 118 (2d Cir.1981); *Shu-Tao-Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 50–51 (2d Cir.1984); *Croce v. Bromley Corp.,* 623 F.2d 1084, 1096–97 (5th Cir.1980), *cert. denied sub nom. Bromley Corp. v. Cortese,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Hansen v. Johns-Manville Products Corp.,* 734 F.2d 1036, 1045 (5th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814; *Fenasci v. Travelers Insurance Co.,* 642 F.2d 986, 989 (5th Cir.), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981).

We note that the Seventh Circuit in *In Re Air Crash Disaster Near Chicago, Ill.,* 701 F.2d 1189, 1199–1200 (7th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983), declined to follow this well-established rule. The court, noting that "[o]rdinarily in diversity cases state law determines the content of jury instructions and federal law governs only the manner in which instructions are requested and given," and explaining that "[t]his rule is rooted in *Erie* principles insofar as the jury instruction expounds substantive state law," nonetheless reasoned as follows to override Illinois law:

That rationale may be lacking in the present case, however, because Illinois law refuses the instruction altogether rather than defining its content, and in any case the substantive law to which the instruction, if given, relates is the Internal Revenue Code. Unless Illinois has a substantive interest in refusing the instruction, therefore, perhaps federal law should control. * * * We also conclude that, although Illinois courts very likely would not instruct the jury that any damages it awarded would be non-taxable, the Illinois practice does not bind the federal courts under *Erie* because * * * Illinois's concerns are either procedural or based on a mistaken view of federal law.

We decline to follow the Seventh Circuit. In our view, the reasons the Seventh Circuit advances to support its holding do not justify a substantial intrusion upon Missouri's right to create its own law free from federal interference.

We must therefore look to Missouri law on this issue. The Supreme Court of Missouri has stated that it is "presumptive prejudicial error" to give a taxability instruction in a case like the one before us.[11] In *Kenton v. Hyatt Hotels Corp.*, 693 S.W.2d 83, 96–97 (Mo. banc 1985), a personal injury action, the court stated:

> [A]ppellants contend it was error for the trial court to refuse their requested Instruction E, "Your verdict will not be subject to any income taxes and you should not consider such taxes in fixing the amount of your verdict" * * *. Appellants rely upon [*Norfolk*]. * * * The trial court here cannot be convicted of error, requiring a new trial, in following the established law of this state with

respect to denial of the giving of an additional instruction to MAI 4.01 on the subject of damages. We have not by decision or order modified MAI 4.01.[12]

We thus conclude that the district court correctly refused Fuqua's proposed jury instruction.

**D. Adams' Cross-Appeal.**

 Finally, Adams cross-appeals, contending that the trial court erred in applying comparative fault to a strict products liability case. This is an issue of substantive Missouri law. We look to the highest court of the state as the final authority on state law. *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 826 (8th Cir.1983). The Missouri Supreme Court recently decided *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491 (Mo. banc 1986), which squarely holds that comparative fault should not be submitted in a strict liability case. This would appear to dispose of the issue, but Fuqua suggests that *Lippard* may not be retroactive. We refrain from deciding the retroactivity issue, however, because the parties have not briefed it and because Missouri decisions may provide an answer before retrial of this case.

---

**11.** The Missouri courts had, at one time, appeared to favor the general policy behind giving such an instruction. *See Dempsey v. Thompson*, 251 S.W.2d 42, 45 (Mo.1952). *Dempsey* was a FELA case decided before Missouri adopted the Missouri Approved Jury Instructions ("MAI"). The MAI (3d ed.) incorporated *Dempsey* and *Norfolk* into instructions 8.01 and 8.02, both limited to FELA cases, by including the sentence: "Any award you may make is not subject to income tax." Missouri declined, however, to extend *Dempsey* and *Norfolk* beyond the FELA context, as shown by MAI 4.01 (the general

damages instruction) and the decision in *Kenton v. Hyatt Hotels Corp.*, 693 S.W.2d 83, 96–97 (Mo. banc 1985).

**12.** MAI 4.01 (3d ed.) provides as follows:

> If you find the issues in favor of plaintiff, then you must award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe he sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.